[No. S053508. July 31, 1997.]

MOUNTAIN LION FOUNDATION et al., Plaintiffs and Appellants, v. FISH AND GAME COMMISSION, Defendant and Appellant; COUNTY OF KERN DEPARTMENT OF PLANNING AND DEVELOPMENT SERVICES, Real Party in Interest and Appellant.

## COUNSEL

Joseph J. Brecher, David L. Henkin and Joel R. Reynolds for Plainitffs and Appellants.

Daniel E. Lungren, Attorney General, Roderick E. Walston, Chief Assistant Attorney General, Charles W. Getz IV, Assistant Attorney General, and John Davidson, Deputy Attorney General, for Defendant and Appellant.

B. C. Barmann, Sr., County Counsel, and Charles F. Collins, Deputy County Counsel, for Real Party in Interest and Appellant.

Robin L. Rivett and M. Reed Hopper as Amici Curiae on behalf of Defendant and Appellant and Real Party in Interest and Appellant.

## OPINION

**BROWN, J.**—The California Endangered Species Act (CESA) provides protection and management resources for certain native species of fish, wildlife, and plants in imminent danger of or threatened with extinction. Under CESA, the Fish and Game Commission (Commission) is assigned the task of establishing a list of endangered species and a list of threatened species. The Commission is required to add or remove species from either list when warranted, and to develop criteria for determining if a species is endangered or threatened.

The litigation in this case followed the Commission's decision to remove the Mojave ground squirrel from the threatened species list. The delisting

decision was the first time since CESA's enactment that protection had been withdrawn from any species.

The Court of Appeal concluded the Commission abused its discretion in removing the ground squirrel from the list of threatened species because the Commission's failure to prepare and certify an environmental impact report (EIR) when evaluating the delisting petition violated the California Environmental Quality Act (CEQA). We conclude: (1) CESA can be harmonized with CEQA; (2) the Commission is entitled to an exemption from the EIR requirement of CEQA when it follows its certified regulatory program; and (3) the Commission abused its discretion in delisting the Mojave ground squirrel by failing to comply with its own procedures. We therefore affirm the judgment of the Court of Appeal.

## I. *Background*

In November 1991, the Commission accepted a petition from the Kern County Department of Planning and Development (Kern County) seeking removal of the Mojave ground squirrel from the list of threatened species. As part of a process lasting nearly two years, the Commission, with assistance from the Department of Fish and Game (Department), solicited public comment, obtained an independent review and report on the status of the ground squirrel, and, after conducting an extensive public hearing, decided to remove the Mojave ground squirrel from the list of threatened species.

Mountain Lion Foundation and others (hereafter referred to collectively as Mountain Lion) filed a petition for writ of administrative mandamus seeking to set aside the Commission's decision. The petition alleged the Commission failed to meet the requirements of CESA, and the Commission's findings are not supported by substantial evidence. The petition also alleged the Commission's delisting was carried out in violation of CEQA. The trial court rejected Mountain Lion's CESA contentions. As to Mountain Lion's CEQA claim, however, the trial court determined that removing the ground squirrel from the threatened species list was an activity subject to CEQA, and that none of the exemptions to CEQA applied. Because the Commission had carried out the delisting without first preparing and certifying an EIR as required under CEQA, the court ordered the Commission to vacate its decision.

Mountain Lion appealed the trial court's judgment in favor of the Commission on the CESA claim, and the Commission and Kern County appealed the trial court's judgment in favor of Mountain Lion on the CEQA claim. The Court of Appeal affirmed the trial court's judgment, holding the Commission did not violate CESA when it delisted the Mojave ground squirrel

but it failed to comply with the requirements of CEQA by not preparing and certifying an EIR prior to the delisting.

We granted petitions for review by the Commission and by Kern County.

## II. *Discussion*

CEQA is a comprehensive scheme designed to provide long-term protection to the environment. (Pub. Resources Code, § 21001; all further statutory references are to this code unless otherwise noted.) In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties. (§ 21000, subd. (g); see generally, *Sierra Club* v. *State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1229 [32 Cal.Rptr.2d 19, 876 P.2d 505] (hereafter *Sierra Club*); *Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278] (hereafter *Laurel Heights*); *Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 [231 Cal.Rptr. 748, 727 P.2d 1029].) CEQA is to be interpreted "to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)

Generally, CEQA applies to discretionary projects. (§ 21080, subd. (a).) A *project* is an activity undertaken by a public agency which may cause a physical change in the environment. (§ 21065; Cal. Code Regs., tit. 14, § 15378; all further citations to title 14, section 15000 et seq. of California Code of Regulations will be referred to as Guidelines.) A *discretionary project* is one subject to "judgmental controls," i.e., where the agency can use its judgment in deciding whether and how to carry out the project. (Guidelines, § 15002, subd. (i); cf. *Friends of Westwood, Inc.* v. *City of Los Angeles* (1987) 191 Cal.App.3d 259, 271-273 [235 Cal.Rptr. 788] [distinguishing decisionmaking discretion subject to CEQA from "ministerial" activity that is not].)

If a public agency proposes to approve a discretionary project, the agency's activity may nonetheless be exempt from CEQA by legislative command. (See, e.g., § 21080, subd. (b) [exempting specific projects from CEQA]; see also §§ 21080.01-21080.03 [exempting from CEQA construction and maintenance of specified prison facilities]; see generally, *Napa Valley Wine Train, Inc.* v. *Public Utilities Com.* (1990) 50 Cal.3d 370, 376 [267 Cal.Rptr. 569, 787 P.2d 976].) Other classes of projects are

"categorically exempt" from CEQA pursuant to administrative regulation because they do not have a significant effect on the environment. (§ 21084; see *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66] (hereafter *No Oil*); *Dunn-Edwards Corp.* v. *Bay Area Air Quality Management Dist.* (1992) 9 Cal.App.4th 644, 653-655 [11 Cal.Rptr.2d 850] (hereafter *Dunn-Edwards*).) Finally, CEQA does not apply if "it can be seen with certainty" that a project will not have a significant effect on the environment. (Guidelines, § 15061, subd. (b)(3); see *No Oil*, *supra*, 13 Cal.3d at p. 74 [discretionary activity having no possibility of causing significant environmental effect not subject to CEQA].) A "[s]ignificant effect on the environment" is a substantial or potentially substantial, adverse change in the environment. (§ 21068.) "Environment" is defined as the "physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, and objects of historic or aesthetic significance." (§ 21060.5.)

Whenever a project may have a significant and adverse physical effect on the environment, an EIR must be prepared and certified. (§ 21100, subd. (a); cf. *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 277-279 [118 Cal.Rptr. 249, 529 P.2d 1017]; *City of Livermore* v. *Local Agency Formation Com.* (1986) 184 Cal.App.3d 531, 538 [230 Cal.Rptr. 867].) An EIR provides the public and responsible government agencies with detailed information on the potential environmental consequences of an agency's proposed decision. (See generally, *No Oil*, *supra*, 13 Cal.3d at p. 81; *Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296, 307 [248 Cal.Rptr. 352].) The EIR describes ways to minimize significant environmental effects, and suggests alternatives to the project, including the option of "no project." (§ 21061; *Laurel Heights*, *supra*, 47 Cal.3d at pp. 390-391; see also Guidelines, § 15126, subd. (d)(4) ["no project" alternative to be considered along with proposed project's environmental impact].)

■ In some cases, notwithstanding a public agency's determination that a proposed activity may have a significant, adverse effect on the environment, an EIR is not required. Certain state agencies, operating under their own regulatory programs, generate a plan or other environmental review document that serves as a functional equivalent of an EIR. (§ 21080.5, subd. (a); *Sierra Club*, *supra*, 7 Cal.4th at pp. 1229-1230; *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 196 [132 Cal.Rptr. 377, 553 P.2d 537] (hereafter *Wildlife Alive*); *Citizens for Non-Toxic Pest Control* v. *Department of Food & Agriculture* (1986) 187 Cal.App.3d 1575, 1584 [232 Cal.Rptr. 729] (hereafter *Citizens*).) Because the plan or document is generally narrower in scope than an EIR, environmental review can be completed more expeditiously. (See Note, *The Timber Harvest Plan Exemption from the California Environmental Quality Act: Due Process and Statutory Intent* (1990) 41 Hastings L.J. 727, 735.)

To qualify, the agency's regulatory program must be certified by the Secretary of the Resources Agency (Secretary). (§ 21080.5, subd. (e).) An agency operating pursuant to a certified regulatory program must comply with all of CEQA's other requirements. (*Sierra Club, supra*, 7 Cal.4th at pp. 1228, 1230-1231; *Mountain Lion Coalition* v. *Fish & Game Com.* (1989) 214 Cal.App.3d 1043, 1051 [263 Cal.Rptr. 104]; *City of Sacramento* v. *State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 976-978 [3 Cal.Rptr.2d 643].)

### A. *Is There an Irreconcilable Conflict Between CESA and CEQA That Exempts the Commission's Delisting Decision From CEQA?*

Kern County, joined by the Commission and amicus curiae Pacific Legal Foundation, contend there is an irreconcilable conflict between CESA and CEQA, and thus the Commission's actions pursuant to CESA must be exempt from the requirements of CEQA. As Kern County posits, CESA mandates a narrow, species-based focus that necessarily precludes consideration of many of the factors that must be evaluated in accordance with CEQA; thus, the Commission's compliance with CEQA will violate CESA.

### 1. *California Endangered Species Act*

To understand the interplay between the two statutory schemes, we review CESA in some detail. In 1970, California became one of the first states in the nation to protect endangered and rare animals. (Stats. 1970, ch. 1510, § 3, p. 2998; *Natural Resources Defense Council* v. *Fish & Game Com.* (1994) 28 Cal.App.4th 1104, 1111 [33 Cal.Rptr.2d 904].) In 1984, these provisions were repealed and replaced with CESA. (Stats. 1984, ch. 1162, §§ 5 & 6, p. 3988; *id.*, ch. 1240, § 1, p. 4243.) In enacting CESA, the Legislature expressly recognized that certain species of wildlife face extinction "because their habitats are threatened with destruction, adverse modification, or severe curtailment, or because of overexploitation, disease, predation, or other factors." (Fish & G. Code, § 2051, subd. (b).) The Legislature further declared, "[I]t is the policy of the state to conserve, protect, restore, and enhance any endangered species or any threatened species and its habitat." (Fish & G. Code, § 2052.)

Under CESA, a native species of bird, mammal, fish, amphibian, reptile, or plant is considered "endangered" when it "is in serious danger of becoming extinct throughout all, or a significant portion, of its range" (Fish & G. Code, § 2062), and "threatened" when it "is likely to become an endangered species in the foreseeable future in the absence of . . . special protection and management efforts." (Fish & G. Code, § 2067.) The Commission is responsible for maintaining lists of endangered and threatened species. (Fish & G.

Code, § 2070.) CESA requires the Commission to add or remove species from either list "if it finds, upon the receipt of sufficient scientific information pursuant to [Fish and Game Code sections 2070-2079] that the action is warranted." (Fish & G. Code, § 2070.)

CESA requires the Commission to establish guidelines permitting interested parties to petition to add a species to, or remove a species from, the endangered or threatened species list, and directs the Department to recommend, and the Commission to adopt, criteria for determining if a species is endangered or threatened. (Fish & G. Code, §§ 2071, 2071.5.) Accordingly, the Commission has regulations governing the submission and review of petitions for listing, "uplisting," "downlisting," and delisting endangered or threatened species. (See Cal. Code Regs., tit. 14, § 670.1.)

CESA establishes a two-step process by which the Commission decides whether to add or remove a species from either the endangered or threatened species list. (*Natural Resources Defense Council* v. *Fish & Game Com.*, *supra*, 28 Cal.App.4th at pp. 1114-1115.) First, a petition to list or delist must provide sufficient scientific information to show a listing or delisting *may* be warranted. (Fish & G. Code, § 2074.2, subd. (a).) For example, the petition must provide scientific information on the species population trend, range, distribution, abundance, and life history, and "any other factors that the petitioner deems relevant." (Fish & G. Code, § 2072.3.) The petition is referred to the Department for evaluation and recommendation either to reject the petition for lack of sufficient scientific information indicating the action may be warranted, or to accept and consider the petition because it includes such information. (Fish & G. Code, § 2073.5.) If the petition is sufficient and is accepted by the Commission, the Department prepares a written status report on the species. (Fish & G. Code, § 2074.6.) Other interested parties may also submit written comments and scientific reports. (Cal. Code Regs., tit. 14, § 670.1, subd. (h).)

On receipt of the Department's report and recommendation, the Commission schedules a hearing for final consideration of the petition (Fish & G. Code, § 2075), and decides whether the petitioned action is warranted or not warranted. (Fish & G. Code, § 2075.5.) Under regulations tracking the definition of endangered species contained in Fish and Game Code section 2062, the Commission is required to find a listing warranted if the continued existence of the species is in serious danger or threatened by any one or any combination of six factors, including "1. Present or threatened modification or destruction of its habitat; [¶] 2. Overexploitation; [¶] 3. Predation; [¶] 4. Competition; [¶] 5. Disease; or [¶] 6. Other natural occurrences or human-related activities." (Cal. Code Regs., tit. 14, § 670.1, subd. (i)(1)(A).) The

Commission may find a delisting warranted if the Commission finds the species' existence no longer threatened by any one or any combination of the same factors. (*Id.,* subd. (i)(1)(B).)

### 2. *Implied Exemption From CEQA*

██ In addressing Kern County's contention that a delisting decision is impliedly exempt from CEQA due to an irreconcilable conflict between CESA and CEQA, we are first guided by the principle stated in *Wildlife Alive, supra,* 18 Cal.3d at page 195, that where exceptions to a general rule are specified by statute, other exceptions are not to be presumed unless a contrary legislative intent can be discerned. Nothing in the language or history of CEQA or CESA indicates the Legislature intended the Commission to be exempt from CEQA when carrying out its responsibilities under CESA. Accordingly, Kern County's argument must be rejected.

The Legislature has provided that certain projects are exempt from the requirements of CEQA. (See §§ 21080, subd. (b), 21084, subd. (a).) The Legislature did not expressly create a CEQA exemption for the Commission's actions under CESA. Nor does CESA include an express exemption from CEQA. It is evident, however, that the Legislature knows how to create such an exception when one is intended. (See, e.g., Health & Saf. Code, § 44561, subd. (a) [bonds issued by pollution control, financing authority exempt from CEQA]; Wat. Code, § 13389 [state and regional water boards exempted from preparing EIR prior to adopting waste discharge requirements]; cf. *Dunn-Edwards, supra,* 9 Cal.App.4th at pp. 658-659 [nothing in Health and Safety Code evidencing legislative intent to repeal CEQA with respect to air districts].)

The Legislature amended CEQA in 1975 by adding section 21080.5, which allows state agencies with environmental responsibilities to use their own procedures for reviewing proposed projects in lieu of an EIR. If the Legislature had believed these agencies were exempt, the amendment would have been a needless act. (*Wildlife Alive, supra,* 18 Cal.3d at pp. 195-196; cf. *Sierra Club, supra,* 7 Cal.4th at pp. 1230-1231 [relying on similar reasoning to reject argument that timber harvesting is exempt from CEQA]; *Environmental Protection Information Center, Inc.* v. *Johnson* (1985) 170 Cal.App.3d 604, 616-617 [216 Cal.Rptr. 502] [same].)

CEQA further provides in section 21004, "In mitigating or avoiding a significant effect of a project on the environment, a public agency may exercise only those express or implied powers provided by law other than [CEQA]. However, a public agency may use discretionary powers provided

by such other law for the purpose of mitigating or avoiding a significant effect on the environment subject to the express or implied constraints or limitations that may be provided by law." This provision strongly suggests the Legislature intended CEQA to apply to all public agencies undertaking discretionary projects and to the fullest extent possible, even if the agency's discretion to comply with all of CEQA's requirements may be constrained by the substantive provisions of the law governing the public agency.[1] Such an intent is inconsistent with Kern County's assertion that incompatibility between the Commission's species-focused determination to list or delist under CESA and the broader requirements of CEQA impliedly exempts the Commission's delisting decision from all of CEQA.

In its brief, amicus curiae Pacific Legal Foundation contends CESA exempts the Commission from the requirements of CEQA because "a delisting decision under CESA is a nondiscretionary biological determination." As previously noted, only *discretionary* projects are subject to CEQA. (§ 21080, subd. (a).) A nondiscretionary or *ministerial* project is exempt. (§ 21080, subd. (b)(1); Guidelines, § 15268.) Thus, if the Commission's decision to delist a species is properly characterized as ministerial, it is exempt from CEQA. Contrary to Pacific Legal Foundation's view, however, the Commission's decision whether or not a delisting is warranted is discretionary within the meaning of CEQA.

The statutory distinction between discretionary and purely ministerial projects implicitly recognizes that unless a public agency can shape the project in a way that would respond to concerns raised in an EIR, or its functional equivalent, environmental review would be a meaningless exercise. (Cf. *Friends of Westwood, Inc.* v. *City of Los Angeles, supra,* 191 Cal.App.3d at p. 267.) Thus, ministerial projects "involv[e] little or no personal judgment by the public official as to the wisdom or manner of carrying out the project. The public official merely applies the law to the facts as presented but uses no special discretion or judgment in reaching a decision. A ministerial decision involves only the use of fixed standards or objective measurements, and the public official cannot use personal, subjective judgment in deciding whether or how the project should be carried out." (Guidelines, § 15369.) By contrast, a discretionary project is one which "requires the exercise of judgment or deliberation when the public agency or body decides to approve or disapprove a particular activity." (Guidelines,

---

[1]The dissent reads section 21004 solely as a limitation on the power provided by CEQA. However, in making clear that provisions of CEQA may be subject to the powers of the public agency, section 21004 also affirms the Legislature's intent that CEQA "be used in conjunction with discretionary powers granted to public agencies by other laws." (Guidelines, § 15040, subd. (a) [conforming the Guidelines to the statute's enactment with clarifying interpretations].)

§ 15357; see *Miller* v. *City of Hermosa Beach* (1993) 13 Cal.App.4th 1118, 1138-1142 [17 Cal.Rptr.2d 408] [applying these definitions to decide whether city's building permit process was subject to CEQA].)

The numerous statutory provisions and administrative regulations governing the listing and delisting process leave no doubt as to the discretionary nature of the Commission's delisting decision. (See, e.g., Fish & G. Code, §§ 2074.2, 2075 [Commission shall *consider* petition]; Cal. Code Regs., tit. 14, § 670.1, subd. (i)(1)(B) [species *may* be delisted if Commission determines its existence no longer threatened by enumerated factors].) The Commission itself appears to understand its determination whether or not a delisting is warranted to be a discretionary one. In the "Notice of Findings" made in connection with the delisting petition at issue here, the Commission stated that under the statutory requirements of CESA, it "must not only consider all of the evidence introduced in the proceedings, but also must weigh and evaluate it—that is, it must determine whether evidence received is scientifically credible, reasonable and reliable." We note that commentators have characterized CESA's listing and delisting process as "quasi-judicial," finding the Commission's "wide discretion to make listing determinations similar to a judge's decision-making role in a courtroom. [Fn. omitted.]" (Dwyer & Murphy, *Fulfilling the Promise: Reconsidering and Reforming the California Endangered Species Act* (1995) 35 Nat. Resources J. 735, 745; see also Kelly & D'Angelo, *Near Extinction: California's Protection of Endangered Species* (Spring/Summer 1990) 10 Cal. Regulatory L. Rptr. 1, 4, 9.)

The procedural facts of this case provide ample evidence of the Commission's exercise of discretion. Here, the Department evaluated the delisting petition to determine whether it contained sufficient scientific information to show the petitioned action may be warranted. The Department concluded the petition was deficient. The Commission declined to follow the Department's recommendation, however, and accepted the petition for consideration. The Department then prepared a comprehensive status review of the Mojave ground squirrel, concluding the delisting was not warranted because the species was likely to become endangered in the foreseeable future. After conducting a public hearing on the delisting petition, the Commission voted to delist the Mojave ground squirrel.

Although the Commission is required to list or delist "if it finds, upon the receipt of sufficient scientific information . . . , that the action is warranted" (Fish & G. Code, § 2070), this standard is not so fixed and objective as to eliminate the need for judgment and deliberation on the Commission's part. Pacific Legal Foundation's characterization of a delisting decision as

"nondiscretionary" cannot be reconciled with the truly discretionary nature of the Commission's statutory responsibilities under CESA, or the Commission's obvious exercise of discretion in this case.

Where a project involves elements of both ministerial and discretionary action, it is subject to CEQA. (Guidelines, § 15268, subd. (d); *Friends of Westwood, Inc.* v. *City of Los Angeles, supra*, 191 Cal.App.3d at p. 271 [observing principle that CEQA applies even where agency's role is largely ministerial].) As previously discussed, the Legislature intended CEQA to apply to discretionary projects, even when the agency's discretion to fully comply with CEQA is constrained by the substantive laws governing its actions. Assuming the Commission's discretion to delist is constrained by CESA, the Commission is obligated nonetheless to comply with CEQA's environmental protection mandate to the greatest extent possible "within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors, supra*, 8 Cal.3d at p. 259.)

Our conclusion here that CEQA applies to the Commission's delisting decision is consistent with numerous decisions of this court and the Courts of Appeal rejecting assertions by state agencies that an incompatibility between their statutory directives and CEQA requirements exempts them from compliance with the latter. (See, e.g., *Sierra Club, supra*, 7 Cal.4th at p. 1231 [timber harvesting under Forest Practice Act]; *Wildlife Alive, supra*, 18 Cal.3d at pp. 198-201 [setting hunting seasons pursuant to Fish and Game Code]; *Bozung* v. *Local Agency Formation Com., supra*, 13 Cal.3d at pp. 282-286 [Knox-Nisbet Act]; *Environmental Protection Information Center* v. *Johnson, supra*, 170 Cal.App.3d at p. 620 [Forest Practice Act]; *City of Coronado* v. *California Coastal Zone Conservation Com.* (1977) 69 Cal.App.3d 570 [138 Cal.Rptr. 241] [Coastal Commission permit issuance procedures].)

■ In further support of its argument that CESA's requirements for carrying out a delisting are irreconcilable with, and therefore exempt from, the requirements of CEQA, Kern County urges this court to adopt the reasoning of *Pacific Legal Foundation* v. *Andrus* (6th Cir. 1981) 657 F.2d 829 (hereafter *Andrus*). The Sixth Circuit Court of Appeals held in *Andrus* that the Secretary of the Interior was not required to file an environmental impact statement pursuant to the National Environmental Policy Act (NEPA; 42 U.S.C. § 4321 et seq.) when making the decision to list a species under the federal Endangered Species Act (ESA; 16 U.S.C. § 1531 et seq.). (*Id.* at pp. 835-837.) For a number of reasons, we decline to follow the reasoning of *Andrus* here.

First, *Andrus* does not present a strong case of statutory irreconcilability warranting an exemption from environmental review. As the United States

Supreme Court's decision in *Flint Ridge Dev. Co.* v. *Scenic Rivers Assn.* (1976) 426 U.S. 776 [96 S.Ct. 2430, 49 L.Ed.2d 205] (hereafter *Flint Ridge*) strongly suggests, a federal agency is exempt from preparing an impact statement under NEPA only when there is a "clear and unavoidable conflict in statutory authority." (*Id.* at p. 788 [96 S.Ct. at p. 2438].)

The question in *Flint Ridge, supra*, 426 U.S. 776, was whether the Secretary of Housing and Urban Development (HUD) was required to prepare an environmental impact statement pursuant to NEPA before allowing a statement of record filed by a real estate developer to become effective within 30 days after it was filed. Under the Interstate Land Sales Full Disclosure Act (15 U.S.C. § 1701 et seq.), the Secretary of HUD has a duty to permit a statement of record to go into effect within 30 days unless the statement was inaccurate or incomplete. The Supreme Court recognized that it was impossible for the Secretary of HUD to prepare an impact statement prior to the date she was obligated to allow the disclosure statement to go into effect. Relying on language in NEPA requiring all federal agencies to comply with the impact statement requirement " 'to the fullest extent possible' " (*Flint Ridge, supra*, 426 U.S. at pp. 778-785 [96 S.Ct. at pp. 2433-2437]), the court concluded that "where a clear and unavoidable conflict in statutory authority exists, NEPA must give way." (*Id.* at p. 788 [96 S.Ct. at p. 2438].) The court held even if the HUD Secretary's duty under the disclosure act to effectuate the disclosure statement constituted federal action significantly affecting the environment, an impact statement need not be prepared. (*Id.* at p. 791 [96 S.Ct. at pp. 2439-2440].)

*Andrus* acknowledged that federal agencies are expected to comply with NEPA unless there is a statutory conflict that expressly prohibits or makes full compliance impossible. (*Andrus, supra*, 657 F.2d at p. 833.) It also recognized the ESA provisions at issue in the case did not create the type of statutory conflict with NEPA that existed in *Flint Ridge*, and did not suggest the preparation of an impact statement would conflict with the Interior Secretary's responsibilities under ESA. Nonetheless, *Andrus* distinguished *Flint Ridge* as a case involving time constraints and the necessity of expeditious action by a public agency. (*Andrus, supra*, 657 F.2d at p. 834.)

Such a narrow reading of *Flint Ridge* is questionable, however, in light of the high court's characterization of its inquiry as whether requiring the preparation of an environmental impact statement "would create an irreconcilable and fundamental conflict with the Secretary's duties" under the statute at issue in the case. (*Flint Ridge, supra*, 426 U.S. at p. 788 [96 S.Ct. at p. 2438]; cf. *Jones* v. *Gordon* (9th Cir. 1986) 792 F.2d 821, 825-826 [federal environmental agencies not exempt from NEPA absent clear and

unavoidable statutory conflict].) Absent such a "clear and fundamental conflict of statutory duty" (*Flint Ridge, supra,* 426 U.S. at p. 791 [96 S.Ct. at p. 2440]), the soundness of the *Andrus* court's holding exempting a listing under ESA from the impact statement requirements of NEPA is open to question.

Kern County argues nonetheless that because CEQA was modeled after NEPA, and CESA was modeled after ESA, *Andrus* presents a proper construction of CEQA and CESA. ██ ██ This court need not follow federal precedent, however, when the federal provisions cannot fairly be said to parallel ours. (Cf. *Wildlife Alive, supra,* 18 Cal.3d at pp. 201-202.) We find the federal statutes at issue in *Andrus* are different in significant respects from the statutory schemes at issue in this case. Thus, we find *Andrus* unpersuasive authority here.

In holding the Secretary of the Interior need not prepare an environmental impact statement before listing a species as endangered or threatened under ESA, the court in *Andrus* reasoned such a requirement would not serve the purposes of ESA or NEPA. (*Andrus, supra,* 657 F.2d at pp. 835-837.) The court found preparation of an impact statement for a listing would be a "waste of time" because the Secretary of the Interior has no authority to consider environmental impact when determining whether to list a species pursuant to ESA. (*Id.* at p. 836.) The court opined the legislative history of ESA suggests the Interior Secretary's duty to list was considered by Congress to be mandatory, not discretionary. (*Andrus, supra,* 657 F.2d at pp. 838-839.) Additionally, the court viewed the requirement of an impact statement before listing a species as threatened or endangered as unnecessary because, by listing a species and thereby working to prevent the irretrievable loss of a natural resource, the Interior Secretary is furthering the environmental protection goals of NEPA. (*Andrus, supra,* 657 F.2d at p. 837.) The court found the legislative history of NEPA to suggest Congress did not intend to subject agencies dedicated to protecting the environment to the requirements of NEPA. (*Andrus, supra,* 657 F.2d at p. 838.)

The *Andrus* court's conclusion that the Secretary of the Interior need not prepare an impact statement before carrying out a listing also rested on the court's view that adding a species to the endangered species list itself furthers the purpose of NEPA, even in the absence of an impact statement. (*Andrus, supra,* 657 F.2d at p. 835.) *Andrus* found in the legislative history of NEPA an indication that Congress did not intend NEPA to apply to federal agencies having environmental responsibilities. (*Andrus, supra,* 657 F.2d at p. 838.) For several reasons, we find the reasoning in *Andrus* inapplicable here.

First, although *Andrus's* observation—that a *listing* serves the same environmental protection goals of NEPA—arguably supports the proposition that preparation of an EIR for a listing under CESA would be an unnecessary exercise, the same cannot be said with respect to a delisting. A delisting by definition *withdraws* existing environmental protections from the affected species. Unlike the arguably superfluous function served by an environmental impact statement in the listing decision at issue in *Andrus, supra,* 657 F.2d at page 836, to require environmental review as part of the Commission's delisting decisionmaking process serves not to duplicate but to further the purposes of CEQA, by bringing to light the possible environmental consequences of the proposed removal of protections from the species. Moreover, the *Andrus* court's reliance on the legislative history of NEPA to support its view that NEPA was not intended to govern the actions of federal environmental agencies has no relevance to our inquiry here. The federal courts have fashioned a functional equivalent test to exempt certain activities of such federal agencies from NEPA requirements. (See, e.g., *Portland Cement Association* v. *Ruckelshaus* (D.C. Cir. 1973) 486 F.2d 375, 384-385 [158 App.D.C. 308]; *Appalachian Power Co.* v. *Environmental Pro. Agcy.* (4th Cir. 1973) 477 F.2d 495, 508.) However, our Legislature has provided in section 21080.5 an express limited exemption from CEQA for qualified state agencies having environmental responsibilities. (Cf. *Wildlife Alive, supra,* 18 Cal.3d at pp. 201-202 [rejecting federal functional equivalent test in light of enactment of section 21080.5].) Thus, even if *Andrus* is correct that Congress did not intend NEPA to apply to federal environmental agencies, the enactment of section 21080.5 precludes the conclusion that the Legislature similarly intended to exempt from CEQA the state's public agencies charged with environmental responsibilities.

Unlike the *Andrus* court's determination that preparation of an impact statement for a listing under ESA would be a "waste of time" (657 F.2d at p. 836), we find a delisting decision under CESA that is made in accordance with CEQA would serve an important purpose in helping to shape and inform the Commission's exercise of discretion. The benefits and purposes of the CEQA process can be reconciled with the Commission's duty under CESA to make a species-focused determination when considering a petition for delisting. Indeed, we are obligated to harmonize the objectives common to both statutory schemes to the fullest extent the language of the statutes fairly permits. (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d at p. 274; *Natural Resources Defense Council, Inc.* v. *Arcata Nat. Corp.* (1976) 59 Cal.App.3d 959, 965 [131 Cal.Rptr. 172] [harmonizing provisions of CEQA and Forest Practice Act]; *Gallegos* v. *State Bd. of Forestry* (1978) 76 Cal.App.3d 945 [142 Cal.Rptr. 86] [same].)

As part of the CEQA review process, an agency that proposes to carry out a discretionary project must provide written responses to significant environmental objections prior to the agency's final decision. (Guidelines,

§§ 15132, subd. (d), 15362, subd. (b); cf. *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1020-1021 [192 Cal.Rptr. 325].) Articulating its reasons for rejecting opposing views in written form while the delisting petition is still pending helps sharpen the Commission's understanding of the significant points raised in opposition to the petition. CEQA also requires the public agency to consider feasible alternatives to the project which would lessen any significant adverse environmental impact. (§§ 21002, 21081; *City of Poway* v. *City of San Diego* (1984) 155 Cal.App.3d 1037, 1045-1046 [202 Cal.Rptr. 366] (hereafter *City of Poway*).) One alternative is "no project." (See Guidelines, § 15126, subd. (d)(2) ["no project" alternative to be considered along with proposed project's environmental impact]; *Dusek* v. *Redevelopment Agency* (1985) 173 Cal.App.3d 1029, 1043 [219 Cal.Rptr. 346].) CESA defines a "threatened" species as a species that "although not presently threatened with extinction, is likely to become an endangered species in the foreseeable future in the absence of the special protection and management efforts required by this chapter." (Fish & G. Code, § 2067.) Thus, when making its delisting decision, the Commission considers the environmental impact of a delisting decision on the subject species. Presumably, the decision to delist is a determination that the withdrawal of CESA protections will not endanger the species in the future. However, the Commission could further benefit by considering a "no project" alternative under CEQA during the delisting process. A delisting decision made in conjunction with CEQA's focus on significant environmental effects will better ensure the delisting itself will not have future environmental consequences that endanger the subject species, and will help prevent expenditure of the Commission's time and resources on a petition seeking the relisting of a delisted species that suffered significant effects as a result of the withdrawal of CESA protections. Under CEQA, a public agency must also consider measures that might mitigate a project's adverse environmental impact, and adopt them if feasible. (§§ 21002, 21081.) Because the decision to withdraw CESA protections from one species could affect other species and flora that share the same habitat, the development, consideration, and adoption of feasible mitigation measures enhance the overall species protection goals of CESA while encouraging a more environmentally sound delisting decision.

In light of the distinctions between CEQA and NEPA, between CESA and ESA, and between a delisting and a listing, and recognizing the utility of the CEQA process to a delisting decision under CESA, we conclude *Andrus* does not constitute persuasive authority for exempting a delisting decision under CESA from the requirements of CEQA on the basis of an irreconcilable statutory conflict.

B. *Is the Commission's Delisting Decision Categorically Exempt From CEQA? (The Categorical Exemption)*

█ Kern County and the Commission claim the Commission's delisting action was categorically exempt from CEQA. The Court of Appeal correctly rejected a similar contention.

The Legislature has directed the Secretary to promulgate a list of classes of projects that have no significant effect on the environment. (§ 21084; Guidelines, § 15300 et seq. [29 classes of categorical exemptions].) A project falling within such a categorical exemption is not subject to CEQA. (*No Oil, supra*, 13 Cal.3d at p. 74; *Dunn-Edwards, supra*, 9 Cal.App.4th at p. 656; *Association for Protection etc. Values* v. *City of Ukiah* (1991) 2 Cal.App.4th 720, 725-726 [3 Cal.Rptr.2d 488].)

The Commission's invocation of a categorical exemption was in error for several reasons. First, a categorical exemption represents a determination by the Secretary that a particular project does not have a significant effect on the environment. (§ 21084.) It follows that an activity that may have a significant effect on the environment cannot be categorically exempt. (Cf. Guidelines, § 15061, subd. (b)(3) [CEQA applies only to projects having potential for causing significant effect on environment; where no possibility that activity will have significant effect, activity not subject to CEQA].) As the interplay between the Commission's regulations and the Guidelines makes clear, the removal of a species from the endangered or threatened species list is an activity that may have a significant effect on the environment. A delisting therefore cannot be categorically exempt.

Under CEQA, an agency contemplating an action having "the potential to . . . reduce the . . . number or restrict the range of an endangered, rare or threatened species" (Guidelines, § 15065, subd. (a)) *must* find that the project "may have a significant effect on the environment" (Guidelines, § 15065), and a species that is currently listed as endangered or threatened under CESA is a "rare or endangered" animal or plant for such purposes. (Guidelines, § 15380.) Under the Commission's regulations governing the review of listing and delisting petitions, a threatened or endangered species that is the subject of a delisting petition retains its protected status throughout the delisting process. (Cal. Code Regs., tit. 14, § 670.1, subd. (i)(1)(B)1.) Because the removal of a species from the endangered or threatened list withdraws existing levels of protection, a delisting creates at least the potential for population reduction or habitat restriction. Thus, the Commission is obligated to find a delisting may have a significant environmental effect. Such a finding precludes invocation of a categorical exemption. (Cf.

*Dunn-Edwards, supra,* 9 Cal.App.4th at pp. 656-658 [holding categorical exemption inapplicable where adoption of regulations tightening emission standards for architectural solvents will result in adverse environmental effects]; *International Longshoremen's & Warehousemen's Union* v. *Board of Supervisors* (1981) 116 Cal.App.3d 265, 276 [171 Cal.Rptr. 875] [same with regard to relaxation of air quality standards].)

The record indicates the Commission claimed the delisting of the Mojave ground squirrel was categorically exempt because it was within the class of "actions taken by regulatory agencies as authorized by state law or local ordinance to assure the maintenance, restoration, or enhancement of a natural resource where the regulatory process involves procedures for protection of the environment." (Guidelines, § 15307; *id.,* § 15308.) Contrary to the Commission's claim of a categorical exemption, however, a delisting action cannot be fairly included within this class of projects. Exemption categories are not to be expanded beyond the reasonable scope of their statutory language. (*Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827, 842 [171 Cal.Rptr. 753].)

The delisting of a species withdraws a number of statutory protections. For example, CESA establishes a policy adding significant weight to the CEQA balancing scale on the side favoring protection of a listed species over projects that might jeopardize them or their habitats. (Fish & G. Code, § 2053.) With limited exceptions, CESA prohibits the taking, importation, possession, sale, or purchase of any endangered or threatened species. (Fish & G. Code, § 2080.) CESA also requires state agencies to consult with the Department to ensure that the agency's action is not likely to "jeopardize" the continued existence of any endangered or threatened species. A finding of jeopardy requires "reasonable and prudent alternatives consistent with conserving the species which would prevent jeopardy." (Fish & G. Code, § 2092, subd. (a).) Because a delisting removes rather than secures these protections, the categorical exemption for actions assuring the maintenance, preservation or enhancement of a natural resource set forth in sections 15307 and 15308 of the Guidelines does not apply. (Cf. *Wildlife Alive, supra,* 18 Cal.3d at pp. 204-206 [categorical exemption for activities assuring maintenance, preservation, or enhancement of natural resource inapplicable to setting of hunting and fishing seasons]; *International Longshoremen's & Warehousemen's Union* v. *Board of Supervisors, supra,* 116 Cal.App.3d at pp. 275-276 [exemption inapplicable to agency action leading to relaxation of air quality standards relating to allowable levels of nitrogen oxide emissions].)

Kern County argues that a delisting should not be viewed as an isolated action, but rather as an integral part of the entire statutory scheme of CESA.

The county posits that because a delisting is merely part of the overall CESA process, and because this process provides for the maintenance, restoration or enhancement of the species, a delisting under CESA is categorically exempt from CEQA pursuant to the relevant Guidelines.

It is apparent that CESA contemplates delistings as an integral part of the entire statutory scheme. Ideally, the delisting of a species signals the successful restoration of a previously endangered or threatened population. Nonetheless, it is significant that CESA does not impose a requirement for species recovery planning as part of the overall statutory scheme. Although the Department is required to conduct a status review of each of the listed species and report its findings and recommendations for species recovery to the Commission (Fish & G. Code, § 2074.6), CESA does not require the implementation of recommendations. For this reason, contrary to the county's argument, it is more appropriate to view the Commission's delisting action as an activity separate from the Commission's consideration of whether or not to provide CESA protections by adding a candidate species to the endangered or threatened species list. Because a delisting involves the removal of, rather than the provision for, the statutory protections of CESA, it cannot be characterized as an action taken to "assure the maintenance, restoration, or enhancement of a natural resource." (Guidelines, § 15307; *id.*, § 15308.)

## C. *The Certified Regulatory Program*

■ The Court of Appeal in this case determined the Commission's delisting of the Mojave ground squirrel was not exempt from CEQA. It also concluded the Commission had to prepare and certify an EIR before removing a species from the threatened species list. In the court's view, the CESA procedures for adding or removing species from the endangered or threatened species list do not qualify as a certified regulatory program providing the functional equivalent of an EIR. The Court of Appeal also found the Commission's existing certified regulatory program is limited to the establishment of hunting and fishing seasons and the related issuance of licenses. We do not agree.

### 1. *The Scope of the Certified Regulatory Program*

As previously noted, section 21080.5 establishes a limited exemption from CEQA's EIR requirements for qualifying state agencies having environmental protection responsibilities. An agency that carries out its discretionary activities according to a regulatory program requiring an environmental plan or document may submit such a document in lieu of an EIR if the Secretary

has certified that the regulatory program meets certain statutory criteria. (§ 21080.5, subds. (a), (d), (e).) For example, an agency seeking certification must adopt regulations requiring that final action on the proposed activity include written responses to significant environmental points raised during the decisionmaking process. (§ 21080.5, subd. (d)(2)(F).) The agency must also implement guidelines for evaluating the proposed activity consistently with the environmental protection purposes of the regulatory program. (§ 21080.5, subd. (d)(2)(B).) The document generated pursuant to the agency's regulatory program must include alternatives to the proposed project and mitigation measures to minimize significant adverse environmental effects (§ 21080.5, subd. (d)(3)(A)), and be made available for review by other public agencies and the public (§ 21080.5, subd. (d)(3)(B)).

The CEQA Guidelines list the certified regulatory programs that the Secretary has determined meet all of the statutory criteria for exemption from EIR preparation set forth in section 21080.5. (Guidelines, § 15251.) Among the programs on this list is "[t]he regulatory program of the Fish and Game Commission pursuant to the Fish and Game Code." (Guidelines, § 15251, subd. (b).)

The Commission's regulatory program was certified by the Secretary in 1976, shortly after this court's decision in *Wildlife Alive, supra,* 18 Cal.3d 190. The court held in *Wildlife Alive* that in light of the Legislature's then recent enactment of section 21080.5 creating an express statutory exemption from EIR requirements for qualifying state agencies, the Commission could not claim an implied exemption from CEQA when setting bear hunting season dates and issuing hunting permits. (18 Cal.3d at pp. 195-198.)

The procedures adopted by the Commission in 1976 and submitted to the Secretary for certification of its regulatory program pursuant to section 21080.5 first appeared as section 3.90 of title 14 of the former California Administrative Code (now California Code of Regulations). In 1982, the section was renumbered section 781.5, without any change in the language. (Cal. Code Regs., tit. 14, § 781.5; all further citations to title 14, California Code of Regulations, section 781.5 will be referred to as Regulatory Program.) The provisions comprising the regulatory program are worded broadly, and, by their terms, apply to the Commission's varied regulatory responsibilities under the Fish and Game Code.

The Commission's review procedures adopted for certification pursuant to section 21080.5 are applicable when the Commission is called on to consider recommendations by the Department regarding the adoption of regulations

"which may have a significant effect on the environment, or it is anticipated that a substantial body of opinion will reasonably consider the environmental effect to be adverse." (Regulatory Program, subd. (a).) For the following reasons, we conclude a delisting under CESA falls within the express terms of subdivision (a), triggering the review procedures established in the regulatory program. First, the delisting process requires the Department to make recommendations to the Commission regarding petitions for delisting. (Fish & G. Code, § 2073.5; see also Fish & G. Code, § 2072.7 [in absence of petition, Department may make recommendation regarding removal of species from endangered or threatened list].) Second, a delisting under CESA requires the adoption of a regulation. In order for a listing or delisting to be effective, the Commission must amend its regulations listing endangered and threatened species. (See Cal. Code Regs., tit. 14, § 670.2 [list of endangered, threatened plants]; *id.*, § 670.5 [animals].) Finally, and as previously discussed, a proposal regarding the *removal* of existing CESA protections for a species on the endangered or threatened species list concerns the adoption of a regulation "which may have a significant effect on the environment." (Regulatory Program, subd. (a).)

Mountain Lion contends the Commission's certified regulatory program does not contemplate a delisting decision under CESA because CESA was enacted in 1984, subsequent to the Secretary's certification in 1976. However, the fact CESA was adopted after the Secretary's certification does not foreclose application of the procedures comprising the Commission's existing certified regulatory program to a delisting decision. To the contrary, it appears the Legislature intended a state agency's certified regulatory program to remain in force notwithstanding subsequent additions and amendments to the program, unless and until the Secretary withdraws the certification.

Section 21080.5, subdivisions (e) and (f) govern the possible effect of subsequent changes in a state agency's regulatory program following certification by the Secretary. Subdivision (e) grants the Secretary authority to certify a regulatory program, and to withdraw such certification after determining that the regulatory program has been altered so that it no longer meets the certification criteria. Subdivision (f) of section 21080.5 provides that once a regulatory program has been certified, "any proposed change in the program which could affect compliance with the qualifications for certification" may be submitted to the Secretary for review and comment. (§ 21080.5, subd. (f).) If the agency decides to submit a proposed change, the Secretary determines "whether the proposed change will alter the regulatory program so that it no longer meets the qualification for certification . . . and will result in a withdrawal of certification as provided in this section." (*Ibid.*)

In enacting these provisions, the Legislature appears to have contemplated that once certification occurs, alterations in the regulatory program through statutory amendment or regulatory change will not affect the program's continued vitality unless and until the Secretary withdraws certification. If the Secretary has not made the determination that changes in the regulatory program affect the qualifications for certification, a state agency acting pursuant to later-enacted amendments to its regulatory program may continue to generate an environmental document in accordance with its own procedures in lieu of preparing and certifying an EIR.

Mountain Lion did not seek in its petition for writ of mandate an order directing the Secretary to withdraw certification of the Commission's regulatory program on the ground it had been impermissibly altered by the enactment of CESA. Nor does it raise such a claim here. Because the statutory directives of CESA do not compromise any of the criteria for certification of the Commission's regulatory program, the Commission may properly utilize the review procedures of its certified regulatory program when proceeding under CESA. (Cf. *Laupheimer* v. *State of California* (1988) 200 Cal.App.3d 440, 459-460 [246 Cal.Rptr. 82] [Department of Forestry need not have resubmitted timber harvesting plan procedures to Secretary when statutory amendments to Forest Practice Act made after certification of regulatory program did not affect certification qualifications].)

Moreover, Mountain Lion points to nothing that suggests the Legislature intended the Commission to refrain from applying the review procedures of its existing certified regulatory program to a delisting decision. We may presume that when it enacted CESA, the Legislature was aware of the regulations adopted to satisfy the requirements of certification pursuant to section 21080.5. (Cf. *Moore* v. *California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1017-1018 [9 Cal.Rptr.2d 358, 831 P.2d 798].) Indeed, as we concluded (*ante*, at p. 123), the review procedures established by the Commission for certification of its regulatory program both complement and enhance the statutory framework of CESA. For these reasons, and notwithstanding the fact that CESA was enacted after the Secretary's certification of the Commission's regulatory program in 1976, we conclude the Commission is entitled to an exemption from the EIR process as provided in section 21080.5 by adhering to its certified regulatory program when carrying out a delisting under CESA.

This conclusion is consistent with the Commission's conduct prior to the litigation in this case. In a document entitled "Notice of Determination," dated September 7, 1993, the Commission's executive director certified that the Commission found the delisting of the Mojave ground squirrel was

"taken in compliance with [the Commission's regulatory program] and Section 21080.5 of the Public Resources Code . . . ." Although the Commission's further declaration the delisting of the Mojave ground squirrel "will not have a significant adverse effect on the environment" was in error, as previously discussed, the Commission's asserted consideration of the possible environmental effects of the delisting decision under the auspices of its certified regulatory program and section 21080.5 provides strong evidence that the Commission can comply with CEQA to the fullest possible extent when evaluating a delisting petition.

As previously noted, the Secretary's certification of the Commission's regulatory program is expressed in broad terms as "[t]he regulatory program of the Fish and Game Commission pursuant to the Fish and Game Code." (Guidelines, § 15251, subd. (b).) Notwithstanding the broadly worded certification, the Court of Appeal concluded the procedures for generating a substitute environmental document did not apply to a delisting under CESA because the certified regulatory program governed only the Commission's establishment of hunting and fishing seasons and issuance of licenses. For several reasons, we disagree with the Court of Appeal's conclusion.

In describing the Commission's certified regulatory program, the Secretary did not qualify or limit its scope to hunting and fishing regulations. The Secretary clearly had the ability and authority to do so, however. In a number of instances, the Secretary has certified a regulatory program that is narrowly defined and restrictive in scope. For example, the Secretary has certified "[t]hat portion of the regulatory program of the Air Resources Board which involves the adoption, approval, amendment, or repeal of standards, rules, regulations, or plans to be used in the regulatory program for the protection and enhancement of ambient air quality." (Guidelines, § 15251, subd. (d); see also id., § 15251, subds. (a) [certifying regulation of timber harvesting operations pursuant to chapter 8, commencing with section 4511, of part 2 of division 4 of the Public Resources Code], (i) [certifying pesticide regulatory program administered by the Food and Agriculture Department and county agricultural commissioners].)

The Court of Appeal relied on several references to the Commission's regulation of hunting seasons and hunting and fishing licenses in the Secretary's 1976 statement of findings for its conclusion that the regulatory program includes only the setting of hunting and fishing seasons and issuance of licenses. The references do not support its conclusion.

When the Commission sought certification of its regulatory program in 1976, the newly enacted statutory exemption only applied to the regulatory

programs of state agencies involved in "the issuance to a person . . . of a lease, permit, license, certificate, or other entitlement for use." (§ 21080.5, added by Stats. 1975, ch. 1187, § 1, p. 2931.) In his statement of findings certifying that the Commission's regulatory program complied with the requirements of section 21080.5, the Secretary identified former California Administrative Code, title 14, section 3.90 (now Cal. Code Regs., tit. 14, § 781.5) as the certified regulatory program. The Secretary noted the regulations adopted by the Commission and set forth in former section 3.90 did not directly involve licensing. Nonetheless, the Secretary found the Commission's regulatory program met the criteria of section 21080.5 because there was a necessary relationship between the Commission's regulation of hunting and fishing and the issuance of licenses by the Department of Fish and Game.

Contrary to the Court of Appeal's conclusion, the Secretary's reference to hunting seasons does not demonstrate that the intended scope of the regulatory program is limited to licensing. It shows only that the Secretary's certification of the Commission's regulatory program was carried out within the scope of his then existing authority. In order for the Commission's regulatory program to comply with the criteria set forth in section 21080.5, the program had to involve "the issuance . . . of a lease, permit, license, certificate, or other entitlement for use." (§ 21080.5, subd. (b)(1).) Under the Fish and Game Code, the issuance of licenses is the responsibility of the Department, not the Commission. The Secretary's reference to the setting of hunting and fishing seasons was made to establish the necessary linkage between the Commission's discretionary regulatory responsibilities and the requirement of section 21080.5, as it then existed. At that time, the certification of a program other than one involving licenses would have exceeded the scope of the Secretary's authority.

Approximately one year after the Secretary's certification of "[t]he regulatory program of the Fish and Game Commission pursuant to the Fish and Game Code" (Guidelines, § 15251, subd. (b)), section 21080.5 was amended to include regulatory programs involving "[t]he adoption or approval of standards, rules, regulations or plans for use in the regulatory program." (Stats. 1977, ch. 1200, § 6.5, p. 3999.) As commentators have observed, it is the language of section 21080.5 and the terms of the agency's certification that determine the scope of the activities entitled to an exemption from the EIR requirements. (Remy et al., Guide to the California Environmental Quality Act (1993 ed.) p. 86; cf. *Citizens, supra*, 187 Cal.App.3d at pp. 1584-1585 [amendment to section 21080.5 made that section applicable to pesticide regulatory program even though original certification by Secretary occurred prior to amendment].)

## 2. *Compliance With the Requirements of the Certified Regulatory Program*

In order to claim the exemption from CEQA's EIR requirements, an agency must demonstrate strict compliance with its certified regulatory program. (§ 21080.5, subd. (a); *Citizens, supra,* 187 Cal.App.3d at p. 1586; *City of Coronado* v. *California Coastal Zone Conservation Com., supra,* 69 Cal.App.3d at p. 581.) We must therefore determine whether the Commission followed its own procedures. For the reasons that follow, we conclude it did not.

Kern County argues we must presume official duty is regularly performed. (Evid. Code, § 664.) However, such a presumption is misplaced in a case like this where the record affirmatively shows the Commission failed to satisfy every requirement of its certified regulatory program. (Cf. *City of Sacramento* v. *State Water Resources Control Bd., supra,* 2 Cal.App.4th at p. 976 [regular performance of official duty presumed in absence of contrary evidence]; see also *Schaeffer Land Trust* v. *San Jose City Council* (1989) 215 Cal.App.3d 612, 622 [263 Cal.Rptr. 813] [appellate court conducts independent review of record to determine whether public agency followed mandatory procedures in arriving at its decision].)

The record indicates the Commission believed a delisting action was categorically exempt from CEQA. As the Commission's executive director told persons attending the Commission's June 17, 1993, public meeting, "in the normal proceedings of listing a species as threatened or endangered, the Commission reserves its actions regarding a CEQA determination until the actual listing of that species. Based on legal advice from the Attorney General's office, we'll follow the same format in delisting and so we will be making a CEQA determination . . . . when we actually take the regulatory action to delist the Mojave ground squirrel . . . ." Thereafter, the Commission filed a notice of exemption with the Office of Planning and Research claiming a categorical exemption from CEQA. The record makes clear the Commission proceeded with the delisting of the Mojave ground squirrel as if the delisting was categorically exempt from CEQA. It follows that the Commission did not faithfully follow the procedures of its certified regulatory program when evaluating the delisting petition.

The record confirms the Commission's failure to satisfy these procedural requirements in several respects. First, the Commission did not respond to significant environmental opposition. The Commission's regulations require that written responses to comments be prepared prior to the final public meeting. Responses to comments received at the final meeting may be made

orally by the Commission during the meeting. The oral responses are included in the official written minutes of the meeting. (Regulatory Program, subd. (h); see also § 21080.5, subd. (d)(2)(D) [written response requirement].)

The Commission received numerous letters and heard testimony raising significant environmental concerns during the petition evaluation process. However, the Commission neither received nor responded on the record to public comments during its final meeting on the delisting proposal. Nor did the Commission prepare written responses to significant environmental objections prior to issuing its final notice of regulatory change removing the Mojave ground squirrel from the threatened species list.

The record shows that, pursuant to the Administrative Procedure Act, the Commission submitted its rulemaking file delisting the Mojave ground squirrel to the Office of Administrative Law (OAL) for approval. The OAL disapproved the Commission's regulatory action because the Commission's final statement of reasons failed to include a summary and response to public comments, in violation of former Government Code section 11346.7, subdivision (b)(3) (now see Gov. Code, §§ 11346.2, 11346.9). In response to the OAL's decision, the Commission submitted an addendum to the final statement of purpose of its regulatory action, summarizing and responding to points raised during the petition review process.

Many of the Commission's responses to public comment included in the addendum address significant environmental points raised during the Commission's review of the delisting petition. However, these responses were clearly made to cure a Government Code deficiency in the regulatory action delisting the ground squirrel, and not in order to comply with the requirements of the Commission's certified regulatory program.

The Commission's post-decisionmaking responses to significant environmental concerns do not satisfy the written response component of its certified regulatory program. Nor do they comply with the spirit of this requirement. The written response requirement ensures that members of the Commission will fully consider the information necessary to render decisions that intelligently take into account the environmental consequences. (Cf. *Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813, 820 [176 Cal.Rptr. 342]; *Rural Landowners Assn.* v. *City Council, supra,* 143 Cal.App.3d 1013, 1020-1021.) It also promotes the policy of citizen input underlying CEQA. (*People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 841 [115 Cal.Rptr. 67].) When the written responses are prepared and issued after a decision has been made, however, the purpose served by such a requirement cannot be achieved.

In addition to the failure to comply with the written response requirement of its certified regulatory program, the Commission did not satisfy the program's directive to assess feasible project alternatives and mitigation measures. The Commission's review procedures prohibit the Commission from adopting proposed regulations "if there are feasible alternatives or feasible mitigation measures available which would substantially lessen any significant adverse impact which the activity may have on the environment, unless specific economic, social or other conditions make infeasible such project alternatives or such mitigation measures." (Regulatory Program, subd. (g); see § 21080.5, subd. (d)(2)(A) [feasibility requirement].)

The Commission's regulation tracks the language of section 21002, one of the substantive provisions of CEQA which the Commission is required to carry out even when operating pursuant to its certified regulatory program. (Guidelines, § 15250; *Sierra Club, supra,* 7 Cal.4th at pp. 1230-1231; *Environmental Protection Information Center, Inc.* v. *Johnson, supra,* 170 Cal.App.3d at p. 617.) Thus, if the Commission satisfies its CEQA obligation to mitigate or avoid significant environmental effects whenever feasible, it has also complied with the corresponding provision in its certified regulatory program.

CEQA's substantive mandate that public agencies refrain from approving projects for which there are feasible alternatives or mitigation measures is effectuated in section 21081. (See *City of Poway, supra,* 155 Cal.App.3d at pp. 1045-1046.) Under this provision, a decisionmaking agency is prohibited from approving a project for which significant environmental effects have been identified unless it makes specific findings about alternatives and mitigation measures. (§ 21081; see also *Environmental Council* v. *Board of Supervisors* (1982) 135 Cal.App.3d 428, 439 [185 Cal.Rptr. 363].) The requirement ensures there is evidence of the public agency's actual consideration of alternatives and mitigation measures, and reveals to citizens the analytical process by which the public agency arrived at its decision. (*Citizens for Quality Growth* v. *City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 440-441 [243 Cal.Rptr. 727]; *City of Poway, supra,* 155 Cal.App.3d at p. 1046; *Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 896 [236 Cal.Rptr. 794].) ■ Under CEQA, the public agency bears the burden of affirmatively demonstrating that, notwithstanding a project's impact on the environment, the agency's approval of the proposed project followed meaningful consideration of alternatives and mitigation measures. (*City of Poway, supra,* 155 Cal.App.3d at p. 1046.) ■ The record in this case indicates the Commission has failed to meet this burden.

There is no evidence in the record the Commission evaluated feasible mitigation measures during its review of the petition to delist the Mojave

ground squirrel. The Commission contends consideration of mitigation measures was unnecessary because a finding that the delisting was warranted under CESA is the equivalent of finding that the delisting would not have a significant, adverse impact on the ground squirrel. The contention has merit. Under CESA, a "threatened" species is a species that although not presently threatened with extinction is likely to become endangered in the foreseeable future in the absence of CESA protections. (Fish & G. Code, § 2067.) Presumably, the removal of a species from the threatened species list would not be "warranted" within the meaning of CESA if to do so was likely to endanger the species in the future. (See Fish & G. Code, § 2070 [Commission shall add or remove species from endangered or threatened list when warranted by sufficient scientific information].) The consideration of mitigation measures to minimize identifiable adverse effects on the candidate species is thus not only unnecessary under CEQA, but would appear to be improper under CESA's substantive provisions. (Cf. *Sundstrom* v. *County of Mendocino, supra,* 202 Cal.App.3d at pp. 308-309 [use permit condition requiring compliance with environmental regulations is proper mitigating measure because compliance avoids potentially significant environmental effects].)

At the same time, however, the delisting decision does not represent a finding with regard to the possible significant effects of a delisting on the environment generally. (Cf. § 21060.5 [defining "environment" broadly as physical conditions which exist within area affected by a proposed project including land, air, water, flora, fauna, etc.].) Because the ground squirrel shares its habitat with other species of plants and animals, some of which are not protected by CESA, it is possible the removal of protections from the one species will have a significant, adverse effect on others. Carrying out a delisting in accordance with CESA thus does not eliminate the need for the Commission to consider and adopt feasible mitigation measures that would lessen or avoid the identified significant environmental impacts of the delisting. As suggested by analysis in the Department's status report in this case, the Commission has the authority to implement a variety of measures to mitigate adverse environmental impacts of a delisting, such as ordering the Department to place affected species on its list of birds and mammals of special concern for further study and observation.

As to CEQA's requirement that public agencies consider project alternatives, the Commission points out that CESA mandates the Commission either grant or deny the delisting petition based on the evidence before it, thereby precluding the Commission from considering or adopting any other alternatives. We find the Commission's point well taken in light of CESA's substantive provisions governing the listing and delisting of species. However, CEQA contemplates a "no project" alternative. (Guidelines, § 15126,

subd. (d)(4).) Thus, CEQA's substantive requirement that the public agency consider feasible project alternatives can be used in conjunction with CESA.

The Commission further argues the record demonstrates it satisfied CEQA's alternatives requirement. We disagree. When the Commission accepted Kern County's petition to delist the Mojave ground squirrel, the Department prepared a report to the Commission reviewing the status of the Mojave ground squirrel and recommending the petitioned action should not be taken. (See Fish & G. Code, § 2074.6.) In its status review, the Department indicated a concern that by delisting the species, the habitat of the Mojave ground squirrel would continue to be destroyed, fragmented, and degraded. The Department was of the view that removing the ground squirrel from the list of threatened species would withdraw not only the protections of CESA, but also the special consideration for the species under CEQA's project-review process and under the multiagency West Mojave coordinated management plan. The Department urged that the only alternative to the proposed regulatory action that would provide the protections equivalent to those of CESA was the continued listing of the ground squirrel as a threatened species under CESA.

The only evidence in the record of the Commission's consideration of this alternative to the proposed delisting appears in its "Final Statement of Purpose for Regulatory Action," a document prepared after the Commission had determined it would approve the delisting petition and had proceeded to amend its regulations to remove the ground squirrel from the threatened species list. The Commission asserted that to make no change in its regulations with respect to the ground squirrel would be "inconsistent with Commission findings." It stated further, without elaboration, that "no alternative considered by the Department would be more effective in carrying out the purposes for which the regulation is proposed or would be as effective and less burdensome to the affected private persons than the proposed regulation."

The Commission's cursory rejection of the alternative to the proposed delisting does not constitute an adequate assessment of alternatives as required under CEQA and the Commission's certified regulatory program. Although the Commission's evaluation and rejection of the Department's recommendation to retain the ground squirrel on the threatened species list need not be exhaustive, it must reasonably reflect that due consideration was given to this alternative. The Commission's rejection of the proposed alternative as "inconsistent with the Commission's findings" fails to provide solid evidence of a meaningful review of the project alternative that would avoid the significant environmental effects identified by the Department.

(Cf. *Sierra Club* v. *Gilroy City Council* (1990) 222 Cal.App.3d 30, 44 [271 Cal.Rptr. 393] [resolution adopted by council evidences the agency's careful consideration and rejection as unfeasible numerous project alternatives]; *Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco* (1980) 106 Cal.App.3d 893, 913-914 [165 Cal.Rptr. 401] [CEQA's findings requirement satisfied where board provided nine different bases for its finding of no feasible alternative to project].)

We conclude the Commission failed to comply with the requirements of CEQA and its own regulatory program when it removed the Mojave ground squirrel from the list of threatened species without responding in writing to significant environmental opposition and without meaningful consideration of the "no project" alternative. Because it did not proceed in accordance with procedures mandated by law, the Commission abused its discretion in delisting the species. (Code Civ. Proc., § 1094.5, subd. (b); cf. *Sierra Club*, *supra*, 7 Cal.4th at pp. 1235-1237 [failure to proceed in accordance with law presumptively prejudicial when mandatory procedures not followed].)

### III. *Disposition*

The judgment of the Court of Appeal affirming the trial court's issuance of a writ of mandate ordering the Commission to set aside the delisting of the Mojave ground squirrel is affirmed.

George, C. J., Mosk, J., Kennard, J., and Werdegar, J., concurred.

**BAXTER, J.**—I respectfully dissent. The California Endangered Species Act (CESA; Fish & G. Code, § 2050 et seq.) states the exact procedures and criteria by which the California Fish and Game Commission (Commission) is to decide whether individual plant or animal varieties shall appear, or continue to appear, on California's "threatened" and "endangered" species lists. A species *must* be listed if "sufficient scientific information" persuades the Commission that the species' continued existence is endangered or threatened. Once listed, a species *must* be removed from the list (delisted), if the Commission determines, from similar "scientific information," that the species faces no imminent or likely threat or danger. The decision requires a detailed study and report by an expert agency, public notice, hearing, and comment, and full and formal findings by the Commission. But the process, while careful and public, is narrowly focused; the determination to list or delist must be based solely upon the ecological health of the species under consideration.

After protracted proceedings under CESA, the Commission found that the Mojave ground squirrel does not meet CESA's standards of threat or endangerment. The Commission explained that the squirrel was originally listed as

"rare," with little evidentiary support, under a predecessor statute, and thus automatically appeared on CESA's "endangered" list without further evaluation of its true status. Moreover, the Commission noted, while reliable estimates of the squirrel's population remain unavailable (and probably impossible), this species ranges throughout a desert habitat of almost 5 million acres, which is largely under public control and faces no significant development. Nor, the Commission concluded, was there evidence of the squirrel's decimation by disease, predation, exploitation, competition, or other natural occurrences or human activity. Accordingly, the Commission determined to delist the squirrel. On administrative mandamus, the superior court upheld the Commission's decision.

However, the majority, like the Court of Appeal, are not content with the workings of CESA's logical, complete, self-contained, and environmentally specific scheme. Instead, they conclude that the Commission's action to delist the Mojave ground squirrel under CESA is invalid because the Commission did not also follow the separate and distinct criteria and procedures of the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.), including CEQA's requirement that an environmental impact report (EIR) or its functional equivalent be prepared and considered.

But by its express terms and design, CEQA forces an agency to address and accommodate broad competing values—environmental, social, and economic—that contradict the narrow focus CESA requires the Commission to take when deciding whether to list or delist a threatened or endangered species. Where the issues considered under both statutes are the same, separate compliance with CEQA is a meaningless and wasteful duplication of CESA's own extensive provisions for full scrutiny and informed public participation. Thus, as two recent federal decisions concluded in the context of analogous federal laws, CEQA has no sensible place in such a proceeding.

For these reasons, I cannot join the majority's strained effort to fit a square peg into a round hole. I conclude that CEQA's EIR and procedural requirements cannot be reconciled with the particular statutes the Commission must apply when listing or "delisting" a threatened or endangered species. In my view, the Commission thus violated no law when it delisted the Mojave ground squirrel but failed to follow CEQA's procedures in addition to CESA's. I would reverse the decision of the Court of Appeal.

I.

The focused purposes of CESA are made clear by its codified findings and policy declarations. These express concern about species of fish, wildlife,

and plants that are "in danger of, or threatened with, extinction" because of overexploitation, destruction of habitat, disease, predation, and other factors. (Fish & G. Code, § 2051, subd. (b).) CESA thus makes it the state's policy to "conserve, protect, restore, and enhance" all "endangered" or "threatened" species and their habitats. (*Id.*, § 2052.)

Once a species is identified as endangered or threatened, it is entitled to a number of statutory protections. For example, with limited exceptions, CESA forbids the import, export, taking, possession, purchase, or sale of endangered or threatened species. (Fish & G. Code, § 2080.) State agencies should not approve projects which jeopardize endangered or threatened species unless specific economic, social, or other conditions make other alternatives infeasible. (*Id.*, §§ 2053, 2054, 2092, subd. (a).) Agencies should use their authority to conserve endangered and threatened species. (*Id.*, § 2055.)

However, the initial determination whether a species qualifies for these protections by virtue of its threatened or endangered status is more narrowly circumscribed. Under CESA, the Commission must maintain a list of threatened and endangered species (Fish & G. Code, § 2070), which are defined by the statute. A species of fish, plant, or wildlife is "endangered" if it is "in serious danger of becoming extinct throughout all, or a significant portion, of its range due to one or more causes, including loss of habitat, change in habitat, overexploitation, predation, competition, or disease." (*Id.*, § 2062.) A species is "threatened" if it is "likely to become an endangered species in the foreseeable future in the absence of the special protection and management efforts required by this chapter." (*Id.*, § 2067.) The Commission "*shall* add *or remove* a species from either [the "endangered" or "threatened" species] list if it finds, *upon the receipt of sufficient scientific information pursuant to this article*, that the action is warranted." (*Id.*, § 2070, italics added.) The Commission is to adopt "criteria for determining if a species is endangered or threatened." (*Id.*, § 2071.5.)

Pursuant to section 2071.5 of the Fish and Game Code, the Commission has promulgated guidelines which further address the standards by which a determination to list or delist should be made. These guidelines closely track the statutory definitions of "endangered" and "threatened" species. Under the guidelines, a species "shall be listed as endangered or threatened . . . if the Commission determines that its continued existence is in serious danger or is threatened by any one or any combination of the following factors: [¶] 1. Present or threatened modification or destruction of its habitat; [¶] 2. Overexploitation; [¶] 3. Predation; [¶] 4. Competition; [¶] 5. Disease; or [¶] 6. Other natural occurrences or human-related activities." (Cal. Code Regs.,

tit. 14, § 670.1, subd. (i)(1)(A).) "A species may be delisted . . . if the Commission determines that its continued existence is no longer threatened by any one or any combination of the factors provided in subsection (i)(1)(A) . . . ." (*Id.*, subd. (i)(1)(B).)[1]

CESA also provides detailed procedures for the Commission's decision to list or delist a species. Listing or delisting may be triggered by the petition of an "interested person," or by a recommendation from the Department of Fish and Game (Department) itself. (Fish & G. Code, §§ 2072.3, 2072.7.) After a noticed hearing, the Commission may reject, without further consideration, any petition or recommendation which does not include sufficient "scientific information" that the action recommended is "warranted." (*Id.*, §§ 2074, 2074.2 (subd. (a)(1).) If the Commission "accepts" the petition or recommendation for further consideration (*id.*, § 2074.2, subd. (a)(2)), the Department must review the status of the subject species, and must provide an expert written report to the Commission. (*Id.*, § 2074.6.) This report, which shall be "based upon the best scientific information available to the department," must "indicate[] whether the petitioned action is warranted," must include "a preliminary identification of the habitat that may be essential to the continued existence of the species," and must "recommend[] management activities and other recommendations for the recovery of the species." (*Ibid.*) The Department's report is supplemented by the public solicitation of "data and comments . . . from as many persons as is practicable." (*Id.*, § 2074.4; see Cal. Code Regs., tit. 14, § 670.1, subd. (h).)

At a further noticed hearing, and after receipt of written and oral comment, the Commission must then make a "finding[]" whether the action of listing or delisting is warranted. (Fish & G. Code, §§ 2075, 2075.5.) Before this "finding[]" can be implemented as a formal rule, the Commission must also comply with the rulemaking provisions of the Administrative Procedure Act. (APA; Gov. Code, § 11340 et seq.) These call for public notice, comment, and hearing, as well as a written statement of reasons with response to public recommendations and objections, as specified by the APA. (Fish & G. Code, § 2075.5, subd. (2); see Gov. Code, §§ 11346.2, subd. (b), 11346.4, subd. (a), 11346.8, subd. (a), 11346.9, subd. (a).)

Thus, in a CESA list/delist proceeding, the Commission is to determine only whether a species meets the statutory and regulatory standards of threat

---

[1]Contrary to the majority's implication, the word "may" in this latter sentence simply confirms that the Commission is not *required to maintain* the species on the list despite a finding that no further threat or danger exists. Indeed, the governing statute (Fish & G. Code, § 2070) makes delisting *mandatory* when the Commission finds a listed species subject to no current threat or danger. Hence, the guideline's wording cannot be construed as authorizing the Commission to *decline* to delist even if it makes such a finding.

or endangerment.[2] The criteria, documents, and procedures by which CESA requires the Commission to make this decision are expressly detailed in CESA, and are tailored to ensure that the Commission's narrow discretion will be carefully and publicly exercised.

On the other hand, CEQA, the state's primary environmental legislation, is concerned with all the environmental effects of a "project" contemplated by a public agency, i.e., any unexempted agency activity that may have a significant adverse environmental effect. (Pub. Resources Code, §§ 21000, 21001, 21065.) CEQA requires agencies, by formal findings, to avoid or mitigate the adverse environmental effects of such activities and decisions to the extent made feasible by economic, social, or other conditions. (*Id.*, §§ 21002, 21002.1, subd. (b), 21081.)

Unless an exemption applies, an agency must issue a "negative declaration," or must prepare and consider an EIR, before undertaking any "project." (Pub. Resources Code, § 21080, subds. (c), (d).) The EIR requirement is intended to induce environmentally sensitive agency decisions by "identify[ing] the significant effects on the environment of a project, . . . identify[ing] alternatives to the project, and . . . indicat[ing] the manner in which those significant effects can be mitigated or avoided." (*Id.*, § 21002.1, subd. (a).)

An EIR, where required, must detail "all" the significant environmental effects of the "project," specifically including its impact on inducing development of land and human population growth, must disclose "any" significant unavoidable effect of the project on the environment, and must list alternatives or mitigation measures to reduce or eliminate these effects. (Pub. Resources Code, §§ 21100, 21100.1.) A "project" may be not be approved if less damaging alternatives or mitigation measures are available, except where "specific economic, social, or other conditions make infeasible such . . . alternatives or . . . mitigation measures." (*Id.*, § 21002.)

Similar standards apply to a "project" which, though subject to CEQA in general, is exempted by CEQA itself from the EIR requirement under the auspices of a "certified" environmental "regulatory program." To be eligible for "certifi[cation]," such a "regulatory program" must, among other things, provide for full environmental consideration under CEQA's standards, pursuant to documentation and procedures which are the functional equivalent

---

[2]Noting the essentially "evidentiary and fact-finding" nature of the Commission's authority in a CESA list/delist proceeding, one recent Court of Appeal decision characterized the Commission's action as "quasi-adjudicatory." (*Natural Resources Defense Council* v. *Fish & Game Com.* (1994) 28 Cal.App.4th 1104, 1116, 1120 [33 Cal.Rptr.2d 904].)

of the EIR process. Under the current statutory provisions, the program must "require[] a plan or other written documentation containing environmental information" (Pub. Resources Code, § 21080.5, subd. (a)); must prohibit approval or adoption of an activity if feasible alternatives or mitigation measures "would substantially lessen *any* significant adverse [environmental] effect" (*id.*, subd. (d)(2)(A), italics added); must provide for public notice, review, and comment (*id.*, subd. (d)(2)(F)); and must mandate the agency's written response to all significant environmental points raised during the evaluation process (*id.*, subd. (d)(2)(D)). Written documentation required by the program must describe the activity, as well as alternatives and mitigation measures "to minimize *any* significant adverse effect" (*id.*, subd. (d)(3)(A), italics added), and must be available for public review and comment (*id.*, subd. (d)(3)(B)).

CESA and CEQA thus establish two independent schemes adapted to two distinct goals. CESA is tailored to provide careful public determination of a narrow issue, i.e., whether *apart from any other concern*, an individual plant or animal species is *in fact* "threatened" or "endangered" as a matter of "scientific information." By contrast, CEQA provides a process to ensure that environmental considerations (including, of course, the "endangered" or "threatened" status of any species) will influence the making and implementation of broader public policy, in which other issues and interests are also properly at play. Aside from a mutual concern with public scrutiny and participation, for which each statute amply provides in its own fashion, the processes of one scheme have little logical relation, in purpose or design, with those of the other. In fact, the Commission cannot follow all the directives of CEQA's EIR provisions, while at the same time adhering to its narrow fact-finding discretion under CESA.

Statutes should be reconciled and harmonized where reasonably possible (e.g., *Hartford Fire Ins. Co.* v. *Macri* (1992) 4 Cal.4th 318, 326 [14 Cal.Rptr.2d 813, 842 P.2d 112]), but courts must avoid statutory constructions that lead to illogical or absurd results (e.g., *Landrum* v. *Superior Court* (1981) 30 Cal.3d 1, 9 [177 Cal.Rptr. 325, 634 P.2d 352]). Here, despite the majority's laborious attempts to demonstrate otherwise, the two statutory schemes at issue are mutually incompatible. CESA, the statute with specific application to the "endangered" and "threatened" species lists, must therefore govern to the exclusion of CEQA's inconsistent provisions.

## II.

Two United States Courts of Appeals have reached the identical conclusion under the analogous provisions of federal law. Though the majority

attempt to distinguish these decisions, the reasoning of the federal cases is pertinent and persuasive.

In *Pacific Legal Foundation* v. *Andrus* (6th Cir. 1981) 657 F.2d 829 (*Pacific Legal Foundation*), the Sixth Circuit Court of Appeals held that when determining whether to list a species as endangered for purposes of the federal Endangered Species Act (ESA; 16 U.S.C.A. § 1531 et seq.), the Fish and Wildlife Service need not comply with the separate provisions of the National Environmental Policy Act (NEPA; 42 U.S.C.A. § 4321 et seq.), including NEPA's requirement for the preparation and consideration of an environmental impact statement (EIS). The Court of Appeals acknowledged that NEPA governs all environmentally significant federal actions " 'to the fullest extent possible.' " (*Pacific Legal Foundation, supra,* 657 F.2d at p. 833; see 42 U.S.C.A. § 4332.) The court further conceded that an ESA listing decision, as such, neither enjoys an express exemption from NEPA, nor is impliedly exempt under a theory of "functional equivalence." (*Pacific Legal Foundation, supra,* at pp. 834-835.) Nonetheless, the court concluded that the two schemes were in conflict, such that simultaneous compliance with both was precluded.

*Pacific Legal Foundation* reasoned primarily that ESA contemplates a mandatory species-focused determination, in which other matters may not be considered, while NEPA "supplements the existing goals of agencies and provides that [they] should also consider environmental concerns. [Citations.]" (*Pacific Legal Foundation, supra,* 657 F.2d at p. 835.) Because "the statutory mandate of ESA *prevents* the Secretary [of the Interior] from considering the [broader] environmental impact when listing a species as endangered or threatened," the issues a valid EIS must identify and discuss cannot be addressed or accommodated. (*Pacific Legal Foundation, supra,* at p. 836, italics added.) The filing of an EIS in a listing proceeding therefore serves the purposes of neither ESA nor NEPA. (*Pacific Legal Foundation, supra,* at pp. 835-836.)

The Court of Appeals specifically rejected the argument, similar to that embraced by the majority here, that an EIS should nonetheless be required in order to serve the public informational goals of NEPA. As the court explained, "this purpose [of informing the public] does not exist independent of the primary purpose to insure an informed decision by the agency contemplating federal action . . . . [T]he [EIS] provides the basis for critical *evaluation* of the agency action by those not associated with the agency. [Citation.] If the agency cannot consider the environmental impact, an [EIS] is useless . . . in evaluating [the agency's] action." (*Pacific Legal Foundation, supra,* 657 F.2d at p. 838, italics in original.)

More recently, another federal appeals court concluded that even when ESA requires consideration of issues beyond the needs of the threatened or endangered species itself, ESA's procedures have "displaced" those of NEPA in this particular area. In *Douglas County* v. *Babbitt* (9th Cir. 1995) 48 F.3d 1495 (*Douglas County*), the Court of Appeals addressed the application of NEPA to the designation, under ESA, of an endangered species' "critical habitat."

As the court explained, whenever a species is listed as endangered or threatened under ESA, the Secretary of the Interior must also designate its "critical habitat," within which locale federal actions likely to disrupt the species are forbidden. (*Douglas County, supra*, 48 F.3d at p. 1497; see 16 U.S.C.A. §§ 1532(5)(A), 1536(a)(2).) Unlike the listing decision itself, the designation of "critical habitat" must consider, in addition to the "best scientific data available[,] . . . the economic impact, and any other relevant impact, of specifying any particular area as critical habitat." (*Douglas County, supra*, at p. 1497; see 16 U.S.C.A. § 1533(b)(2).) The "critical habitat" designation must be preceded by notice to the public, the affected states, and the scientific community, and by a public hearing if one is requested. (*Douglas County, supra*, at p. 1503; see 16 U.S.C.A. § 1533(b)(5).)

Despite ESA's mandate to consider all "relevant impact[s]" of a "critical habitat" designation, the *Douglas County* court held that NEPA's EIS requirement is inapplicable in this context. The court reasoned, inter alia, that in a statutory scheme adopted and amended after NEPA, Congress made no mention of NEPA, instead providing careful and comprehensive, but clearly disparate, statutory procedures by which the designation of critical habitat was to occur. Thus, the court concluded, by rendering the provisions of NEPA "superfluous" in this regard, Congress had made an implicit choice that the specific procedures set forth in ESA for the "critical habitat" determination should displace those of NEPA. (*Douglas County, supra*, 48 F.3d at pp.1502-1503.)

The federal courts' reasoning is compelling for purposes of the analogous California statutes. Here, as in the federal scheme, the decision to list or delist a threatened or endangered species is governed by specific and comprehensive legislation that was adopted after the statute addressing environmental decisionmaking in general. California's endangered species statute, like its federal counterpart, makes no mention of other environmental laws, but instead mandates particular agency action after the exercise of a narrow, scientific, and species-focused fact-finding discretion. In California, as under federal law, the nature of the decision required is incompatible with the

broader interest-balancing function of environmental statutes like CEQA and NEPA. And CEQA, like NEPA, has no pure "informational" function where the "information" at issue could have no actual effect on the agency's decision.

Moreover, in our state, as under the federal analogs, the specific statutory procedures for a list/delist action are detailed, distinct, and tailored to the particular scope of the agency's discretion. Hence, it is sensible to infer that our Legislature, like Congress, has "displaced" more general procedures which might otherwise apply, and has rendered them "superfluous."

The majority, however, reject the federal courts' analyses for purposes of California law. Their reasons for doing so are unpersuasive.

First, the majority suggest that even under the controlling federal law, *Pacific Legal Foundation, supra,* 657 F.2d 829, "present[s] [no] strong case of statutory irreconcilability warranting an exemption from environmental review." (Maj. opn. *ante,* at p. 120.) According to the majority, *Pacific Legal Foundation* rests on a "questionable" interpretation of the federal irreconcilability standard set forth in *Flint Ridge Dev. Co.* v. *Scenic Rivers Assn.* (1976) 426 U.S. 776 [96 S.Ct. 2430, 49 L.Ed.2d 205]. In *Flint Ridge,* the United States Supreme Court concluded that because NEPA "was not intended to repeal by implication any other statute," a federal agency is exempt from NEPA's EIS requirement where compliance would create a "clear and unavoidable conflict in statutory authority." (*Flint Ridge, supra,* 426 U.S. at p. 788 [96 S.Ct. at p. 2438].)

As the majority note, *Flint Ridge* considered whether the Secretary of Housing and Urban Development must prepare an EIS pursuant to NEPA before allowing a "statement of record" filed under the Interstate Land Sales Full Disclosure Act (Act) to go into effect. Under the Act, the Secretary had no discretion to disapprove a statement except for facial inaccuracy, and the statement automatically became effective unless the Secretary notified the filing developer within 30 days that the statement was deficient. Finding it "inconceivable" that NEPA's EIS process could be completed within the mandatory 30-day period provided by the Act, the high court held that NEPA must give way. (*Flint Ridge Dev. Co.* v. *Scenic River Assn., supra,* 426 U.S. at pp. 788-791 [96 S.Ct. at pp. 2438-2440].)

In *Pacific Legal Foundation,* the court acknowledged that the "time constraint" at issue in *Flint Ridge* was not present (*Pacific Legal Foundation, supra,* 657 F.2d at p. 835), but it nonetheless found a similar degree of incompatibility between two statutory schemes. Contrary to the majority's

contention, nothing in *Pacific Legal Foundation* is inconsistent with *Flint Ridge*. *Flint Ridge* applied the sensible principle that if a statute imposes specific duties on a particular agency, or limits that agency's discretion, in a way that precludes compliance with other, generally applicable laws, the latter must defer to the former. As *Pacific Legal Foundation* explained at length, ESA presents such a conflict with NEPA.

An identical tension arises between CESA and CEQA. *Pacific Legal Foundation*'s conclusions were sound for purposes of federal law, and they are equally compelling here.

The majority suggest that significant differences between the state and federal schemes diminish the force of the federal decisions for California purposes. In particular, the majority stress that CEQA, unlike NEPA, includes no implied exception for "functional equivalence," but exempts "functionally equivalent" environmental schemes from the EIR requirement only under the express provision for "certified regulatory programs" (*Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 204 [132 Cal.Rptr. 377, 553 P.2d 537] (*Wildlife Alive*); Pub. Resources Code, § 21080.5).

However, the federal decisions that found NEPA inapplicable to endangered species listing proceedings under ESA did not primarily rely on any federal theory of "functional equivalence" between the two schemes. Indeed, as *Pacific Legal Foundation, supra,* 657 F.2d 829, acknowledged, the listing or delisting of a species under ESA is *not* exempt from NEPA for any such reason. On the contrary, the federal cases reasoned that the goals, purposes, standards, and agency discretion contemplated by the two schemes are *incompatible*, such that where the more specific statute expressly applies, it *displaces* the more general. Similar considerations apply here.[3]

In sum, the majority provide no convincing reason to depart from the federal precedent when deciding the issue presented here. I would embrace those authorities, by analogy, as dispositive.

---

[3]The majority suggest the relevance of *Pacific Legal Foundation, supra,* 657 F.2d 829, is reduced by that decision's substantial reliance on the premise that the *listing* of a species as endangered or threatened under ESA necessarily *promotes* environmental goals regardless of compliance with NEPA. Such reasoning, the majority conclude, has no force in a *delisting* proceeding, where the result may be to *withdraw* environmental protections to which the species was formerly entitled. Whatever the merits of this argument in the abstract, it distorts the analysis of *Pacific Legal Foundation*. That case did suggest, as a "makeweight," that NEPA need not apply because a decision to list a species as endangered or threatened can only benefit the environment in any event. (See *Pacific Legal Foundation, supra,* 657 F.2d at p. 837.) However, the principal thrust of the decision, equally applicable here, is that the standards and procedures governing agency action under the two statutory schemes are in irreconcilable conflict.

## III.

The majority offer other arguments for a conclusion that CEQA must apply to a list/delist decision under CESA. First, they note that the Legislature has provided express exemptions from CEQA where it deemed such treatment appropriate. (Citing Pub. Resources Code, §§ 21080, subd. (b) [miscellaneous exemptions for "functional equivalence" and for certain projects meeting strong environmental, commercial, or transportation needs], 21084, subd. (a) ["categorical exemptions" for projects having no significant adverse environmental effect]; Health & Saf. Code, § 44561, subd. (a) [financing and construction of pollution and waste management control facilities]; Wat. Code, § 13389 [adoption by regional water quality control boards of local standards for waste discharge into sources of drinking water].) But the Legislature's determination that some government activities are exempt for policy reasons which *outweigh* the application of CEQA has little bearing on the issue here—whether two particular statutory schemes exhibit such conflicting designs, functions, purposes, and procedures that they cannot reasonably be applied at the same time.

The majority also assert that California courts have "consistently" rejected claims of statutory incompatibility with CEQA. (Citing, e.g., *Wildlife Alive*, *supra*, 18 Cal.3d 190, 198-201 [setting of hunting seasons pursuant to Fish and Game Code]; *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 282-286 [118 Cal.Rptr. 249, 529 P.2d 1017] [approval by local agency formation commission of municipal annexation pursuant to Knox-Nisbet Act]; *Environmental Protection Information Center* v. *Johnson* (1985) 170 Cal.App.3d 604, 620 [216 Cal.Rptr. 502] [approval of timber harvesting plan under Forest Practices Act]; *City of Coronado* v. *California Coastal Zone Conservation Commission* (1977) 69 Cal.App.3d 570, 581 [138 Cal.Rptr. 241] [coastal commission permit issuance procedures]; also cf. *Sierra Club* v. *State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1231 [32 Cal.Rptr.2d 19, 876 P.2d 505] [application of CEQA's non-EIR provisions to Forest Practices Act].) In none of the cited examples, however, was an agency expressly constrained, contrary to CEQA, to focus on one severable aspect of environmental policy, then provided with detailed procedures, different from CEQA's, but tailored to ensure that this narrowly focused environmental decision would be made in an informed, careful, sensitive, and public way.

CEQA, like NEPA, must be interpreted "to afford the fullest *possible* protection to the environment within the *reasonable* scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049], italics added.) However, no inference arises that CEQA may ride roughshod over the clearly contrary

provisions of another statutory scheme, simply because neither statute has expressly recognized the conflict.

## IV.

The majority concede, if reluctantly, that CESA does not permit a list/delist decision to be influenced by environmental impacts beyond the ecological status of the subject species itself. However, the majority urge, this limitation does not preclude a harmonized application of CEQA to a CESA proceeding.

First, the majority point to a particular section of CEQA, Public Resources Code section 21004, as an indication that CEQA was intended to apply, in adapted form, even where agency discretion is limited by other statutes. Section 21004 provides that, in mitigating or avoiding a significant effect of a project on the environment, a public agency may exercise its "discretionary powers," express or implied, as provided by "other law," but *"only"* such powers. (Italics added.)[4]

This statute provides no support for the majority's views. By its plain terms, although Public Resources Code section 21004 allows agencies to ameliorate environmental effects through use of their existing "discretionary powers," the statute does not enlarge the limited and narrowly focused "discretion" the Commission may exercise in a list/delist proceeding under CESA.

When it adopted Public Resources Code section 21004 in 1982, the Legislature explained at length the statute's purpose and effect. Section 21004 was designed to address *pending litigation* which asserted that CEQA independently empowered all agencies to "impose fees and other exactions" to achieve environmental ends. (Stats. 1982, ch. 1438, § 4, subd. (b), p. 5485.) On the contrary, the Legislature declared, while agencies may use their *existing* powers—such as the powers to levy fees, impose exactions, or condemn property, if present—with CEQA's environmental goals in mind, agencies acquire no new or different enforcement powers solely by virtue of CEQA. (*Id.*, subd. (a), p. 5484.)

This amendment to CEQA, designed to clarify that statute's *limitations* in a particular context, cannot be construed to *extend* the reach of CEQA's EIR

---

[4]Public Resources Code section 21004 provides: "In mitigating or avoiding a significant effect of a project on the environment, a public agency may exercise only those express or implied powers provided by law other than this division. However, a public agency may use discretionary powers provided by such other law for the purpose of mitigating or avoiding a significant effect on the environment subject to the express or implied constraints or limitations that may be provided by law."

provisions by superimposing them over the express and conflicting provisions of other environmental laws. If Public Resources Code section 21004 has any implications for the issue presented by this case, they are contrary to the one seized upon by the majority.[5]

Finally, the majority falter when they attempt to explain *how* CEQA's EIR's procedures (or the "functionally equivalent" process set forth in the Commission's "certified regulatory program") can be adapted to a list/delist proceeding, and *why* such an adaptation serves the purposes of both statutes. In these strained and tortured efforts, the fallacy of the majority's position becomes apparent.

First, the majority suggest, adherence to CEQA forces the Commission to consider environmentally sensitive "alternatives" to the proposed "project." But as the majority appear to concede, in CESA proceedings to remove a species from the threatened or endangered list, the Commission has only two "alternatives." These choices are to delist if "scientific information" persuades the Commission that the species is not endangered or threatened, and to refrain from delisting if the evidence is otherwise.

These limited "alternatives," and the pertinent evidence bearing on each, are necessarily set forth in the documentation and public commentary required by CESA itself. Moreover, as previously indicated, CESA provides its own careful and detailed procedures for ensuring the Commission's reasoned choice between the only two available "alternatives." The Commission must make a "finding[]" whether the requested action to delist is "warranted." That "finding[]" is subject to judicial review of the Commission's reasoning, and cannot be formally implemented in any event until the rulemaking processes of the APA have been completed. Here, the Commission explained in detail its reasons for concluding that the Mojave ground

---

[5]The majority suggest at length that the Commission's decision, under CESA, to delist the Mojave ground squirrel was exempt from CEQA's EIR requirement only to the extent expressly excused by strict compliance with the alternative procedures set forth in the Commission's "certified regulatory program." (See Pub. Resources Code, § 21080.5; Cal. Code Regs., tit. 14, § 781.5.) But the Secretary of the Resources Agency only "certified" the "regulatory program" administered by the Commission in *1976*, thus exempting *the 1976 "program"* from the EIR requirement of CEQA. This 1976 "certifi[cation]" raises no inference that the Commission's proceedings *under CESA* are part of the "certified regulatory program," or are otherwise subject to CEQA. The "program" the Secretary "certified" did not include the subsequently adopted CESA, with its distinct procedural provisions. Indeed, because the procedures set forth in the Commission's "certified regulatory program" were intended as the "functional equivalent" of the preparation and consideration of an EIR under CEQA, they are as much at odds with the detailed procedural requirements of CESA as is CEQA itself. (See text discussion, *ante*, pp. 141-142.) Hence, the Commission's "certified regulatory program" cannot be viewed as evidence of harmony between CESA and CEQA.

squirrel was not endangered or threatened within the meaning of CESA, and must therefore be delisted. Accordingly, the majority make no convincing case that CEQA must be superimposed on CESA in order to ensure the Commission properly considers available "alternatives."

Next, the majority insist that an EIR or equivalent document will identify measures to "mitigate" the "project's" adverse environmental effects. But as the majority acknowledge, the consideration of "mitigation measures" to avoid any adverse effect of delisting on the subject species is simply inappropriate. Because a species may not be delisted if it is threatened or endangered, the decision to delist is a determination that *no such threat or danger exists*. Accordingly, there is no place or need for the "mitigation" of "adverse" environmental impacts to which a species might be exposed by a decision to delist it.[6]

Thus left to grasp at straws, the majority proffer a more convoluted theory for the relevance of CEQA's "mitigation" requirements. The majority suggest that even if a *decision whether to delist* must focus solely on the ecological status of the listed species itself, the Commission may take steps otherwise within its authority to mitigate any adverse effects of its decision on *other* flora and fauna that share the subject species' habitat. Consideration of an EIR or equivalent document during the delisting process, the majority reason, will ensure identification of any such incidental species impacts, and of feasible measures to mitigate or avoid them. For example, the majority suggest, if an EIR prepared for proceedings to delist one species discloses that the delisting may adversely affect another species, the Commission might consider such remedial actions as "ordering the Department to place [the incidentally] affected species on its list of birds and mammals of special concern for further study and observation." (Maj. opn., *ante*, at p. 135.)

The majority thus imply the need for two simultaneous and parallel proceedings. One proceeding, under CESA, must determine narrowly whether a listed species should be delisted on the basis of its own ecological status. Another equally elaborate proceeding, under CEQA, must identify and mitigate any and all adverse "incidental" effects of the delist decision on

---

[6]Apparently desperate to demonstrate how an EIR under CEQA would promote and complement the narrow goals of a delisting proceeding under CESA, counsel for appellant suggested at oral argument that an EIR would have forced the Department to conduct the reliable count of the Mojave ground squirrel's population which is missing from the current record. But the expert species status report required from the Department under CESA itself should contain such a count where the information is pertinent and available; an EIR adds nothing in this respect. Here, the record makes clear that a reliable count of the Mojave ground squirrel population is lacking for reasons of practicality and availability which have nothing to do with the absence of an EIR under CEQA.

plants and animals whose status is *not* under formal consideration.[7] Thus, in the majority's view, the CEQA "tail" wags the CESA "dog."

The short answer is that in a proceeding to list or delist a particular species, CESA mandates a focus on the status of that species alone. The statute does not contemplate that a proceeding to consider whether one species is threatened or endangered shall become a forum for debate about the status of others. By the same token, CEQA seeks to ensure that an agency will decide on the basis of full environmental information whether to authorize or implement *the "project" itself*. Under CESA, as the majority admit, the Commission's decision *whether to delist* one species cannot be based on the possible incidental impacts on other species. Hence, in this respect as well, the majority has provided no justification for "grafting" an EIR requirement onto a CESA list/delist proceeding.[8]

The majority find one other reason, relevant to this case, why the Commission should be subject to CEQA's procedures as well as CESA's when deciding whether to remove a species from the endangered or threatened list. The majority suggest that the Commission violated its own "certified regulatory program," and thus erred under CEQA, when it made a "finding[]" to delist the Mojave ground squirrel (Fish & G. Code, § 2075.5) without *simultaneously* providing a public response to each "significant environmental objection[]" raised by the public comments and testimony. (See Pub. Resources Code, § 21080.5, subd. (d)(2)(D); Cal. Code Regs., tit. 14, § 781.5, subd. (h).) That CESA and the APA require such responses, in writing, before the Commission's "finding[]" can be implemented as a formal rule is insufficient, in the majority's view, because it does not serve CEQA's purpose of demonstrating that the relevant environmental issues were fully considered *in advance* of the agency's actual "final decision."

Again, the majority's value judgments are contrary to the Legislature's own policy and procedural choices when it adopted CESA. In the first place,

---

[7] By the majority's topsy-turvy logic, these incidentally affected species would apparently be entitled to more sensitive consideration than the candidate for delisting itself. The majority concede that because delisting means the subject species itself is not *endangered or threatened*, an EIR would not have to identify measures to "mitigate" the adverse environmental effect of delisting on that species. On the other hand, according to the majority, the EIR would have to disclose "mitigation" measures for *other* flora and fauna whose threatened or endangered status is not even at issue. This cannot be the law.

[8] Of course, the Department and the Commission should always identify and respond to any environmental concern for which they are responsible by law. It does not follow, however, that a proceeding to delist *one* species under CESA is *invalid* under CEQA unless it included an EIR alerting the Commission to the potential effect on *other species*, even though such information could have no legal effect upon the Commission's specific decision whether to delist.

CESA *does not permit* the Commission to *consider*, much less "respon[d]" to, environmental considerations beyond the threatened or endangered status of the individual species under consideration. On the other hand, CESA provides in detail for public participation adapted to the limited nature of the Commission's discretion. These procedures include public notice, hearing, and comment, a formal "finding[]" of "warranted" action, and an equally public APA rulemaking process in which the Commission must make a complete response to pertinent comments and objections. (See discussion, *ante*, pp. 140-141.) The majority present no convincing reason why this considered process must, or even may, give way to conflicting provisions of CEQA.

## V.

In sum, I am persuaded that CESA and CEQA represent distinct and exclusive statutory schemes, tailored to different purposes and goals, and incapable of reconciliation. Accordingly, I conclude that the Commission acted properly insofar as it adhered to CESA's procedures in its decision to delist the Mojave ground squirrel, without additional efforts to comply with the conflicting provisions of CEQA. I would therefore reverse the judgment of the Court of Appeal.

Chin, J., concurred.