Filed 8/25/16  P. v. Perkins CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ELONZIA PERKINS, JR.,<br><br>　　　Defendant and Appellant. | A144225<br><br>(Contra Costa County<br>　Super. Ct. No. 51305390) |

　　　This is an appeal from judgment after a jury convicted defendant Elonzia Perkins, Jr., of second degree murder and negligent discharge of a firearm, and found true the allegation that he personally used a firearm, causing death.  On appeal, defendant raises several challenges to the trial court's instructions to the jury with respect to the issues of self-defense and the lesser included offense of involuntary manslaughter.  We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

　　　On August 27, 2014, an amended information was filed charging defendant with murder (Pen. Code, § 187) (count one); being a felon in possession of a firearm (Pen. Code, § 12021, subd. (a)(1)) (count two); and firing at an occupied vehicle (Pen. Code, § 246) (count three).[1]  It was further alleged with respect to counts one and three that defendant personally used a firearm, causing death, within the meaning of section 12022.53, subdivisions (b), (c), and (d).  In addition, the information alleged both prior felony convictions and one strike offense.

---

[1]　　　Unless otherwise stated, all statutory citations herein are to the Penal Code.

1

Trial by jury began on September 8, 2014, at which the following evidence was presented. On August 1, 2009, just before 4:00 a.m., Lisa Pipkins arrived at 1209 West Street in Pittsburg, to retrieve her employee name tag from the house of her friend, Karen Dimaggio, while en-route to an early morning shift. As she approached, Pipkins heard a car engine revving erratically. Pipkins told Dimaggio about this odd noise, and Dimaggio then decided to investigate. Dimaggio walked down West Street, looking at each vehicle. As she reached the residence at 1165 West Street, Dimaggio found a man in a blood-stained shirt slumped over the driver's seat of a Chevy Cavalier.[2]

Shortly thereafter, Pittsburgh Police Officer William Hatcher was dispatched to the scene, arriving within minutes of Dimaggio. As he moved his police vehicle behind the parked Chevy, Officer Hatcher heard the engine revving loudly and saw exhaust fumes. It appeared to the officer that the vehicle had been left in park, and that the slumped-over man, later identified as Daniel Harrington (victim), had his foot on the gas pedal. All four doors were closed, three windows were rolled up, and the fourth window was rolled down about three inches. Finding the victim unresponsive and with what appeared to be a gunshot wound, Officer Hatcher turned off the engine and began to secure the scene. Officer Hatcher later reported there were no weapons or narcotics in the Chevy. The victim, in turn, had a $20 bill clenched in his left hand, a wallet with identification in his back pants pocket, and about $65 and change in his left front pocket.

Pittsburgh Detective Edgar Sanchez joined Officer Hatcher at the scene. He observed an apparent gunshot entry wound on the victim's right shoulder, as well as an exit would on the victim's left side. Based on his observation of damage to the vehicle's B pillar, the detective concluded the gunshot had been fired from the vehicle's front passenger seat. Detective Sanchez further observed a cigarette butt with an inch-long ash on the driver's seat, as well as a beer can in the center console with the mouthpiece facing the front passenger seat.

---

[2] A neighbor, Christina Atkinson, testified that she believed the residence at 1165 West Street was a "drug house" because she routinely saw people drive up in their vehicles, meet briefly with one of the residents, and then drive away.

Pittsburgh Police Inspector Conaty and his partner went to interview Ronald Bryant (also known as La-La), a resident of 1165-1167 West Street, on August 19, 2009. At the residence, they found defendant seated on a couch on the upper porch. Conaty asked defendant if he was aware that a homicide had recently occurred in the area, and defendant responded that he was not. Conaty then described the victim to defendant and asked whether he had seen such person in the area. Defendant responded in the negative. Defendant added that he had just returned from Brentwood, where he had been staying due to "female problems." He acknowledged being on parole, but denied having dealt drugs since the last time he had been in trouble.

Police laboratory technicians tested DNA retrieved from the beer can found in the victim's vehicle and, when the profile was run through the CODIS system, defendant's name was returned. On October 17, 2012, defendant provided an actual reference sample, which matched the DNA from the beer can at a frequency of one in 110 quadrillion African-Americans, one in 670 quintillion Caucasians, and one in 7.5 sextillion Hispanics.

Nicole Arteaga, defendant's longtime, on-and-off-again girlfriend and mother of his three children, testified that defendant was often in the West Street vicinity, a known drug area, because his uncle, La-La, lived at 1165-1167 West Street. On the day in question, Arteaga had been at a bus stop on West 10th Street, not far from the crime scene, between 5 a.m. and 6 a.m. on her way to work, and had heard the police commotion. Bystanders at the bus stop told her there had been a homicide. A few weeks later, defendant appeared at her house on York Street, asking to take a shower. He appeared anxious, stressed and unbathed and, during his shower, called her into the bathroom to ask whether she had heard anything about the August 1 homicide. When she said that she had, defendant told her that he was the killer, but insisted it was an accident, as he had not intended to kill anyone. Defendant explained that he had been in a car with a man doing a drug deal, when the man suddenly reached under the driver's seat. Defendant, who had his gun out and positioned at the man's side, thought the man was reaching for a weapon, so he fired. Defendant told Arteaga that he was thinking of

3

turning himself in since it was an accident, but then stated that he was also thinking about leaving town.

Over the next few years, Arteaga repeatedly threatened to turn defendant into police, particularly when he showed up at her house unexpectedly. Defendant would respond with his own threats to harm or kill her if she did. Arteaga took these threats seriously, as defendant had beaten her in the past, and, in 2010, she got a restraining order against him.

In October 2012, Inspectors Conaty and Deplitch approached Arteaga, falsely representing to her that defendant had already admitted killing the victim in self-defense, and insisting they merely sought confirmation of his story from her. Believing the inspectors' representation, Arteaga told them what defendant had said about his role in the homicide the day he used her shower a few weeks after the crime.

Arteaga subsequently testified at defendant's preliminary hearing. Not long afterward, she took her children to visit defendant at jail. When they were leaving, defendant told Arteaga while laughing: "Hey, you think we can forget about that conversation in the bathroom?" Arteaga told him to stop talking and walked away.

On September 29, 2014, the jury acquitted defendant of first degree murder, but found him guilty of the lesser offense of second degree murder. In addition, the jury acquitted him of firing at an occupied vehicle, but found him guilty of the lesser offense of grossly negligent discharge of a firearm. The jury then found true the allegation that defendant personally and intentionally discharged a firearm, causing death. In a bifurcated trial, the court found defendant guilty of being a felon in possession of a firearm, and found true the prior felony allegations. The court subsequently found untrue the prior strike allegation.

On January 30, 2015, the trial court sentenced appellant to an aggregate term of 41 years to life. Defendant filed a timely notice of appeal on February 2, 2015.

## DISCUSSION

Defendant raises the following issues for our consideration. First, defendant contends the trial court erred two-fold when giving the jury an ambiguous and misleading

4

supplemental instruction regarding the right of an "initial aggressor" to claim self-defense.  Second, defendant contends the trial court erred by instructing the jury on the theory of contrived self-defense in the absence of sufficient evidentiary support.  Third, defendant contends the trial court misinstructed the jury on the lesser included offense of involuntary manslaughter.  Finally, defendant claims prejudice arising from each of these alleged errors, as well as from the cumulative effect of multiple instructional errors with respect to his self-defense theory.  We address these issues in turn after setting forth the governing law.

## I.     The Applicable Law of Self-Defense/Instructional Error.

The rules guiding our review of defendant's claims of instructional error with respect to his self-defense theory (theories) are well-established.  Turning first to the substantive law, "[t]he elements of murder are (1) an unlawful killing of a human being . . . (2) committed with malice aforethought.  (§ 187, subd. (a).)  Malice may be express or implied.  (§ 188.)  Malice is implied 'when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.' [Citation.]"  (*People v. Timms* (2007) 151 Cal.App.4th 1292, 1296.)  Manslaughter, on the other hand, is "the unlawful killing of a human being without malice." (§ 192.)

" 'A murder . . . may be reduced to voluntary manslaughter if the victim engaged in provocative conduct that would cause an ordinary person with an average disposition to act rashly or without due deliberation and reflection.' " (*People v. Enraca* (2012) 53 Cal.4th 735, 758-759.)  For example, the ordinary self-defense doctrine, sometimes referred to as perfect self-defense, is applicable "when a defendant *reasonably* believes that his safety is endangered."  (*People v. Enraca, supra,* 53 Cal.4th at p. 761.)  Further, " 'one who kills in imperfect defense of others — in the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury — is guilty only of manslaughter.' [Citation.]  . . . To satisfy the imminence requirement, '[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm — will not suffice.  The defendant's fear must be of *imminent* danger to life or great

5

bodily injury. " '[T]he peril must appear to the defendant as immediate and present and not prospective or even in the near future. *An imminent peril is one that, from appearances, must be instantly dealt with*.'. . . [¶] . . ." Put simply, the trier of fact must find an *actual* fear of an *imminent* harm.' (*In re Christian S*. (1994) 7 Cal.4th 768, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574].) . . . [¶] Imperfect defense of others, like imperfect self-defense, is not a true defense, but a shorthand description for a form of voluntary manslaughter. (See *People v. Elmore* (2014) 59 Cal.4th 121, 134 [172 Cal.Rptr.3d 413, 325 P.3d 951]; [*People v.*] *Randle* [(2005)] 35 Cal.4th [987,] 997 [defendant lacked malice required for murder].) It follows that voluntary manslaughter arising from the imperfect defense of another is a lesser included offense of the crime of murder." (*People v. Trujeque* (2015) 61 Cal.4th 227, 270-271. See also *People v. Elmore* (2014) 59 Cal.4th 121, 138 ["unreasonable self-defense entails a reaction that is '"caused by the circumstances," ' " rather than one based upon the defendant's "purely delusional perceptions of threats to personal safety"].)

Here, defendant challenges the trial court's instructions to the jury with respect to the relevant principles of self-defense. As defendant notes, "a defendant has a right to an instruction that pinpoints the *theory* of the defense." (*People v. Panah* (2005) 35 Cal.4th 395, 486.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.] ' " 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" ' [Citation.] ' "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088-1089.)

With these legal principles in mind, we return to defendant's arguments.

## A. Instruction on the Right of an "Aggressor" to Invoke Self-Defense.

Defendant contends, first, that a supplemental instruction given to the jury at the prosecutor's request and over his objection was misleading and ambiguous, such that it was reasonably likely to have caused the jury to misapply the law. The challenged supplemental instruction is as follows: "An aggressor whose victim fights back in self-defense may not invoke the doctrine of self-defense against the victim's legally justified acts." According to defendant, the supplemental instruction "obscured" the fact than an aggressor, like defendant, may in fact invoke self-defense so long as the defendant reasonably believed the victim was the initial aggressor (to wit, perfect self-defense), or unreasonably, but actually, believed the victim was the aggressor (to wit, imperfect self-defense).[3] Defendant thus argues the jury may have misapplied the supplemental

---

[3] This instruction was supplemental to the standard instruction on self-defense that was given to the jury, which tracked CALCRIM No. 3470. This standard instruction, which has not been challenged on appeal, reads as follows: "505. Justifiable Homicide: Self-Defense or Defense of Another. The defendant is not guilty of murder or manslaughter if he was justified in killing someone in self-defense. The defendant acted in lawful self-defense if: (1) The defendant reasonably believed that he was in imminent danger of being killed or suffering great bodily injury; (2) The defendant reasonably believed that the immediate use of deadly force was necessary to defend against that danger; [¶] AND [¶] (3) The defendant used no more force than was reasonably necessary to defend against that danger.

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of death or great bodily injury to himself. Defendant's belief must have been reasonable and he must have acted only because of that belief. The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation. If the defendant used more force than was reasonable, the killing was not justified.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed. If the defendant's beliefs were reasonable, the danger does not need to have actually existed.

"The defendant's belief that he was threatened may be reasonable even if he relied on information that was not true. However, the defendant must actually and reasonably have believed that the information was true.

7

instruction to reject out of hand his perfect or imperfect self-defense theory upon finding that he was the aggressor even though, as a matter of law, he could have prevailed on his theory even if he was the aggressor so long as the jury found true, as a matter of fact, that he reasonably believed, or unreasonably but actually believed, the victim was the aggressor. We reject this argument for several reasons.

First, the law is clear that a party may not complain on appeal that a jury instruction otherwise correct in the law and supported by the evidence is ambiguous or incomplete unless the party requested in the trial court a modification to, amplification of or clarification of the challenged instruction. (*People v. Guiuan* (1998) 18 Cal.4th 558, 570 [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language' "]; *People v. Rundle* (2008) 43 Cal.4th 76, 151 ["[t]he long-standing general rule is that the failure to request clarification of an instruction that is otherwise a correct statement of law forfeits an appellate claim of error based upon the instruction given"], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 394.) Here, while defense counsel objected that the supplemental instruction "interferes with the jury's deliberations and highlights certain elements of the law that are otherwise included in the instructions already," he did not propose, or even request, a clarification or amplification of the instruction. As such, defendant may not argue on appeal that the trial court's instruction, otherwise correct in law, was ambiguous, misleading or incomplete in his case. (*Ibid.*)

Moreover, and in any event, the question on appeal is whether there is a reasonable likelihood the jury could have misconstrued or misapplied the law of self-

"A defendant is not required to retreat. He or she is entitled to stand his or her ground and defend himself or herself and, if reasonably necessary, to pursue an assailant until the danger of death/great bodily injury has passed. This is so even if safety could have been achieved by retreating. Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of murder or manslaughter."

8

defense when the supplemental instruction is considered in light of the entire jury charge, as well as the record as a whole, not when it is considered in mere isolation. (*People v. Ramos, supra*, 163 Cal.App.4th at p. 1088.) Here, there is no such likelihood. As the People note, the source of the supplemental instruction was a footnote in the California Supreme Court decision, *In re Christian S*. (1994) 7 Cal.4th 768, 773, fn. 1, which states: "It is well-established that the ordinary self-defense doctrine – applicable when a defendant reasonably believes that his safety is endangered –may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault of the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified. (See generally, 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 245, p. 280; 2 Robinson, Criminal Law Defenses (1984) § 131(b)(2), pp. 74-75.) It follows, a fortiori, that the imperfect self-defense doctrine cannot be invoked in such circumstances. For example, the imperfect self-defense doctrine would not permit a fleeing felon who shoots a pursuing officer to escape a murder conviction even if the felon killed his pursuer with an actual belief in the need for self-defense."

The supplemental instruction in our case comports with the legal principle(s) set forth in the California Supreme Court's footnote. To wit, an "aggressor," as the term is used in the supplemental instruction, includes "a defendant who, though his own wrongful conduct . . . has created circumstances under which his adversary's attack . . . is legally justified." (*In re Christian S., supra,* 7 Cal.4th at p. 773, fn. 1.) Thus, an "aggressor," like the defendant who, in acting unlawfully, created circumstances under which his adversary's attack was legally warranted, cannot benefit from the exculpatory effects of the self-defense doctrine, even if he or she harbored a reasonable belief, or an unreasonable but actual belief, that the unlawful conduct toward his or her adversary was necessary for self-preservation. Or, otherwise stated, it is the defendant's initial actions with respect to the victim, not the defendant's response to the victim's actions, that

determines the applicability of the self-defense doctrine.[4] (*Ibid.*; see also Millman, Sevilla & Tarlow, California Criminal Defense Practice, ch. 73, § 73.11 (Matthew Bender, 2016) ["a defendant has a valid defense to a crime if the defendant's use of force in self-defense was reasonable in the circumstances and did not exceed that necessary to prevent the impending injury. [Fn.] *The defense is generally unavailable if the defendant was the aggressor in the situation that brought about the danger of harm . . . .*"] [italics added].)

Moreover, the evidence in this case fully supported the prosecution's theory, reflected in the supplemental instruction, that defendant was the initial aggressor who created circumstances under which the victim was legally justified in taking action in self-defense and, thus, that defendant was barred from invoking the doctrine of self-defense. To wit, defendant's former long-term girlfriend and mother of his children, Arteaga, testified consistently with her statement to police that defendant admitted placing his gun "to the victim's side" while they were seated in the victim's Chevy consummating a drug deal. It was only then that, according to what defendant told Arteaga, the victim reached under his seat, possibly for a weapon, triggering in defendant the belief (reasonable or not) that he needed to fire his gun to preserve his own life. Inexplicably, defendant fails to account for this evidence in his briefing. However, there is no contrary evidence in the record to cast doubt on defendant's admitted role as the instigator of aggression, directing his gun at the victim's body before the victim took any action that could have led defendant to believe that he needed to protect himself against deadly force.

---

[4]     This bar to invocation of the self-defense doctrine does not apply where an aggressor or mutual combatant "really and in good faith endeavored to decline any further struggle before the homicide was committed," in which case the killing is deemed justifiable homicide. (See § 197, subd. (3).) However, defendant does not claim for purposes of appeal that he endeavored in good faith to end his confrontation with the victim prior to the shooting, rendering the justifiable homicide doctrine irrelevant to our discussion.

Accordingly, because the supplemental instruction comports with both the law of self-defense and the evidence presented at trial, defendant's challenge fails. Quite simply, the jury could have reasonably found on this record and in light of the jury charge as a whole that, because defendant acted as the initial aggressor in placing a gun to the victim's side, he was not entitled to invoke the doctrine of self-defense, perfect or imperfect, to justify his subsequent shooting of the victim, notwithstanding the victim's apparent attempt to reach under his seat for a weapon. (See *People v. Frye* (1998) 18 Cal.4th 894, 957 [" ' "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. [Citations.]" ' "].)

Finally, in reaching this conclusion, we acknowledge defendant's related contention that the term "aggressor," as used in the supplemental instruction, was prejudicially ambiguous or misleading when considered in conjunction with CALCRIM No. 3471, which instructed the jury that a person who "engages in mutual combat or starts a fight" has a right to self-defense only if he: (1) "actually and in good faith tried to stop fighting," (2) "indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting," and (3) gave his opponent "a chance to stop fighting." According to defendant, the jury was reasonably likely to have misinterpreted or misapplied this language because the instructions failed to distinguish "between the person who created or contributed to a volatile situation and the person whose *physical* act or threat of a *physical* act fixed the legal point at which his opponent could *physically* respond in self-defense."

As an initial matter, as before, defendant's challenge fails on forfeiture grounds. Defendant, who does not claim the supplemental instruction or the version of CALCRIM No. 3471 read to the jury misstated the law, made no effort in the trial court to request or propose any modification or clarification of the instructions and, thus, cannot claim prejudicial ambiguity or confusion on appeal. (E.g., *People v. Rundle, supra*, 43 Cal.4th at p. 151.)

11

Further, even assuming for the sake of argument that defendant's proposed legal distinction between those who initiate aggression by use of physical force and those who do so by nonphysical force has merit, we question, on this record, the impact it could have made. As we just pointed out, the only on-point evidence produced at trial was that defendant placed a gun to the side of the victim during a drug deal and, only then, when the victim reacted by reaching below his seat for what defendant believed was a weapon, did defendant shoot and kill the victim. Thus, the evidence showed defendant not only "created or contributed to a volatile situation" by placing his gun on the victim's body, but that, in doing so, he engaged in the "*physical* act [that] fixed the legal point at which his opponent could *physically* respond in self-defense." There was no contrary evidence. At the same time, the jury was given a comprehensive set of instructions on the doctrine of self-defense, including standard versions of CALCRIM Nos. 3470, 3471, and 3472, none of which have been challenged on appeal. As such, even assuming the two instructions cited above could be deemed ambiguous when considered together based upon their failure to distinguish between physical and non-physical acts (a point we need not reach), we would nonetheless conclude any such ambiguity was harmless.[5] As

---

[5]    We reject defendant's claim that the more-stringent standard of prejudice, set forth in *Chapman v. California* (1967) 386 U.S. 18, applies because the purported errors with respect to the supplemental instruction infringed upon his constitutional rights to present a defense and to have each element of the crime proved beyond a reasonable doubt, requiring reversal unless the error was harmless beyond a reasonable doubt. (See *People v. Thomas* (2013) 218 Cal.App.4th 630, 645 [concluding that, in a murder case, failure to give a heat-of-passion instruction implicates the federal Constitution].) Rather, we agree with the People that prejudice in this context is properly assessed under *People v. Watson* (1956) 46 Cal.2d 818, 836. Indeed, this is not a case where the court wholly failed to instruct on the doctrine of self-defense. Rather, as defendant acknowledges, the jury was read a panoply of standard instructions regarding this substantive defense. Nor is this a capital murder case. Under these circumstances, we disagree with defendant that his constitutional rights were implicated by the court's purported failure to provide clearer instructions. (*People v. Breverman* (1998) 19 Cal.4th 142, 178 [failure to properly or fully instruct the jury on a lesser included offense in a noncapital case does not require reversal unless " 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred"].)

12

before, there is simply no reasonable likelihood the jury could have misapplied the court's instructions on self-defense, read as a whole and in connection with the factual record, in a way that could have caused defendant any undue prejudice. (See *People v. Frye, supra,* 18 Cal.4th at p. 957.) We thus continue on to the next issue.

### B. Instruction on Contrived Self-Defense.

Defendant next argues the trial court erred in instructing the jury on the doctrine of contrived self-defense because there was no evidence in the case to support it. We again disagree.

The challenged instruction, which tracked CALCRIM No. 3472, reads as follows: "A person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

Defendant does not quarrel with the legal correctness of this instruction; nor could he. (See *People v. Hinshaw* (1924) 194 Cal. 1, 26 ["self-defense is not available as a plea to a defendant who has sought a quarrel with the design to force a deadly issue and thus, through his fraud, contrivance or fault, to create a real or apparent necessity for making a felonious assault"].) Defendant nonetheless disputes that there was evidence that he "provoked [the victim] into an attack that [he] then warded off through contrived self-defense." He then argues that, "in the absence of any evidence on which to accurately focus the instruction, the jury would interpret it to mean that Perkins, engaged in a drug deal, had intentionally placed himself in a potentially volatile and violent situation, and could not, in accord with the instruction, therefore invoke a right to self-defense. This is not the law."

Defendant's argument again fails on the record. As we have already twice discussed, there was evidence in the form of Arteaga's testimony that defendant told her that he placed his gun "to the side" of the victim before the victim reached under his seat (possibly for a weapon), instilling in defendant a belief in the need to defend himself against potentially lethal force. This evidence, viewed in a light favorable to the judgment, supported the court's instruction on contrived self-defense. To wit, the jury could have reasonably found based on Arteaga's testimony that defendant did indeed

13

provoke a fight with the victim by placing a gun to his side during a drug deal with the intent to create an excuse to then fire this gun at the victim, thereby causing his death. Nothing more was required. (See *People v. Marshall* (1997) 15 Cal.4th 1, 39-40 [trial court must give a requested instruction if it is supported by substantial evidence, meaning "evidence sufficient to deserve jury consideration"].)

## II.     Instruction on Involuntary Manslaughter.

Defendant further argues the jury was misinstructed on his theory of involuntary manslaughter, which, in turn, was based upon his statement that he accidentally shot the victim during the course of a drug deal.

The challenged instruction on involuntary manslaughter, a modified version of CALCRIM No. 580, was as follows:

"When a person commits an unlawful act but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter.

"The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter.

"The defendant committed involuntary manslaughter if:

1.     The defendant committed a crime;

2.     The defendant committed the crime with criminal negligence; AND

3.     The defendant's acts caused the death of another person.

"The People allege that the defendant committed the following crime: brandishing a firearm in the presence of an occupant of a motor vehicle, in violation of Penal Code section 417.3.

"Instruction 980 tells you what the People must prove in order to prove that the

14

defendant committed the crime of brandishing a firearm in the presence of an occupant of a motor vehicle.

"Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment. A person acts with criminal negligence when:

1.        He or she acts in a reckless way that creates a high risk of death or great bodily injury;

AND

2.        A reasonable person would have known that acting in that way would create such a risk.

"In other words, a person acts with criminal negligence when the way he or she acts is so different from the way an ordinarily careful person would act in the same situation that his or her act amounts to disregard for human life or indifference to the consequences of that act.

"The People allege that the defendant committed the following crime with criminal negligence: brandishing a firearm in the presence of an occupant of a motor vehicle. You may not find the defendant guilty unless all of you agree that the People have proved that the defendant committed that act.

"In order to prove murder or voluntary manslaughter, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to kill or with conscious disregard for human life. If the People have not met either of these burdens, you must find the defendant not guilty of murder and not guilty of voluntary manslaughter."

The court then instructed the jury on the crime of Brandishing Firearm in Presence of Occupant of Motor Vehicle, codified in section 417.3, as follows:

"To Prove that the defendant is guilty of this crime, the People must prove that:

1.        The defendant drew or exhibited a firearm in the presence of another person who was in a motor vehicle that was being driven on a public street or highway;

2.        The defendant drew or exhibited the firearm against the other person in a threatening manner that would cause a reasonable person to fear bodily harm;

15

AND

3.    The defendant did not act in self-defense. [¶¶ ]."[6]

Defendant's challenge to these instructions is two-fold. First, defendant argues the statutory offense of brandishing that underlies the involuntary manslaughter instruction in this case is, by its nature, an inherently dangerous felony rather than mere criminal negligence and, thus, under the instruction, could not support a finding of involuntary manslaughter. Second, defendant argues the section 417.3 offense requires evidence that the brandishing occurred within a *moving* vehicle and, here, he claims, there is no such evidence. Under these circumstances, defendant insists the trial court should have simply instructed the jury that it could find him guilty of the lesser offense of involuntary manslaughter so long as there was evidence he committed "an unlawful killing without the intent to kill and without conscious disregard for human life," without reference to the brandishing offense. According to defendant, requiring the jury to find true the elements of felony brandishing as a predicate for returning a verdict of involuntary manslaughter despite the lack of evidentiary support was prejudicial error. For reasons to follow, we disagree.

As an initial matter, as the People note, both parties' counsel concurred on the trial court's selection of the underlying offense of brandishing a firearm in the presence of a motor vehicle occupant for the involuntary manslaughter charge. In any event, putting aside defendant's complicity in the purported error, and assuming for the sake of argument he is correct that use of the section 417.3 offense for purposes of the involuntary manslaughter charge was erroneous, we nonetheless conclude there is no basis on this record for finding undue prejudice. (See *People v. Breverman* (1998) 19

---

[6]    Section 417.3 provides in relevant part: "Every person who, except in self-defense, in the presence of any other person who is an occupant of a motor vehicle proceeding on a public street or highway, draws or exhibits any firearm, whether loaded or unloaded, in a threatening manner against another person in such a way as to cause a reasonable person apprehension or fear of bodily harm is guilty of a felony punishable by imprisonment pursuant to subdivision (h) of Section 1170 for 16 months or two or three years or by imprisonment for 16 months or two or three years and a three thousand dollar ($3,000) fine."

16

Cal.4th 142, 178 [failure to properly or fully instruct the jury on a lesser included offense in a noncapital case does not require reversal unless " 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred"].)

First, as defendant accepts, involuntary manslaughter requires evidence that the killing was committed without malice. (*People v. Cook* (2006) 39 Cal.4th 566, 596.) "Malice is implied, however, when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (*Ibid*.) Here, the evidence showed that defendant directed a firearm at the victim while seated in a closed vehicle, placing the deadly weapon at the victim's side before pulling the trigger and thereby causing his death. While defendant may have described this incident to Arteaga as an accident given that he had not intended to kill the victim, there was no evidence to contradict his statement to Arteaga that his gun was already out, directed at the victim's side, before defendant fired the weapon in response to the victim's sudden motion of reaching under the seat.[7] As such, notwithstanding defendant's argument on appeal, the actual evidence presented at trial raised no material issue as to whether he acted without malice, such that the trial court had no sua sponte duty to give an involuntary manslaughter instruction. (*People v. Cook. supra,* 39 Cal.4th at p. 596; *People v. Benavides* (2005) 35 Cal.4th 69, 102 ["a court is not obligated to instruct on involuntary manslaughter in the absence of substantial evidence that the defendant killed his victim ' " 'in the commission of an unlawful act, not amounting to [a] felony; or in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection" ' "].)

In addition, as the People also point out, the jury found true the allegation that defendant "personally discharged a firearm" and "intended to discharge a firearm" within the meaning of section 12022.53, subdivision (d). Given these findings, the jury

---

[7]    Defendant rested without presenting any evidence at trial.

17

necessarily determined that defendant's act of shooting and thereby killing the victim was intentional, and not merely unlawful and without knowledge of the danger to or conscious disregard for human life. (See *People v. Benavides, supra,* 35 Cal.4th p. 103.) As such, the jury implicitly rejected any theory that defendant accidentally fired his weapon, rendering any misdirection of the jury on the issue of involuntary manslaughter of no consequence. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1085-1086 ["Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to defendant under other properly given instructions"].)

Accordingly, for the reasons stated, we decline to find error or prejudice with respect to the involuntary manslaughter instruction in this case.

## III.     Cumulative Error.

Finally, defendant contends the cumulative effect of the purported instructional errors by the trial court was to deprive him of his right to due process under the federal Constitution. Under the "cumulative error" doctrine, we reverse the judgment if there is a "reasonable possibility" that the jury would have reached a result more favorable to defendant absent a combination of errors. (E.g., *People v. Williams* (2009) 170 Cal.App.4th 587, 646; *In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32 ["Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial"].)

We reject this argument. As we have discussed at length above, few if any instructional errors were made at trial, and no prejudicial error occurred that would require reversal. As the California Supreme Court explains, "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Here, even assuming defendant's trial was imperfect, there has been no clear showing that miscarriage of justice occurred. (See *People v. Cuccia* (2002) 97 Cal.App.4th 785, 795 ["The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial' "].)

18

# DISPOSITION

The judgment is affirmed.

_____
Jenkins, J.

We concur:

_____
McGuiness, P. J.

_____
Pollak, J.

*People v. Elonzia Perkins, Jr.*, A144225

19